## Commonwealth *vs.* Bruce C. Johnson.

Suffolk. January 12, 1995. - June 9, 1995.

Present: Liacos, C.J., Wilkins, Abrams, Nolan, Lynch, O'Connor, & Greaney, JJ.

*Identification. Practice, Criminal*, Motion to suppress.

At a pretrial hearing on a motion to suppress an identification of the defendant by the victim of a larceny, evidence that the showup employed by the police was conducted eighteen hours after the crime, that it took place in the area of a housing project where the victim had seen his assailants drive after the crime, that the defendant was brought forward from the group before the victim positively identified him, and that the defendant was wearing clothes similar to those worn by one of his assailants, warranted a finding by a judge that the identification procedure was unnecessarily suggestive. [461]

Statement of the rule of per se exclusion, set forth in *Commonwealth* v. *Botelho*, 369 Mass. 860 (1976), regarding the admissibility of out-of-court identifications obtained through unnecessarily suggestive procedures. [461-464]

Statement of the "reliability" test, set forth in *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), regarding the admissibility of out-of-court identifications obtained through unnecessarily suggestive procedures. [464]

This court concluded that, with regard to the admissibility of out-of-court identifications obtained through unnecessarily suggestive procedures, it could not accept the reasoning of the "reliability" test as set forth in *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), as satisfying the due process requirements of art. 12 of the Declaration of Rights of the Massachusetts Constitution, but that art. 12 requires the application of the per se rule of exclusion described in *Commonwealth* v. *Botelho*, 369 Mass. 860 (1976). [464-472] Nolan, J., dissenting, with whom Lynch, J., joined; Greaney, J., dissenting, with whom Lynch, J., joined.

Complaint received and sworn to in the Boston Municipal Court Department on April 9, 1992.

On appeal to the jury session of that court, a pretrial motion to suppress evidence was heard by *Raymond G. Dougan, Jr.*, J., and the case was tried before *Roanne Sragow*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Patricia A. O'Neill*, Committee for Public Counsel Services (*Timothy G. Watkins*, Committee for Public Counsel Services, with her) for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant appeals from his conviction of larceny from a person after a trial by a jury of six in the Boston Municipal Court Department. The sole issue on appeal is whether the judge erred in denying the defendant's motion to suppress the victim's pretrial identification after concluding that the identification procedure was unnecessarily suggestive. We granted the defendant's application for direct appellate review. We reverse.

We recite the facts found by the judge. On April 7, 1992, Leopoldino Goncalves[1] was working at a parking lot on the corner of Traveler Street and Washington Street in Boston. After he finished work, at approximately 10:50 P.M., Goncalves walked across the street to use a public telephone that was located on Washington Street. Street lights provided the only illumination.

When Goncalves finished using the telephone, a white female with a limp approached him and asked him for a dollar. Goncalves told the woman that he did not have any money. A black male armed with a machete then approached. The man grabbed Goncalves's wallet and at the same time the woman snatched money from Goncalves's front pocket. The assailants discarded the wallet after removing the money. They left the area together in an automobile. Goncalves pursued them in his own automobile, but he lost sight of them in

---

[1] The judge referred to the victim in his findings as Goncalves. However, the briefs before this court refer to the victim as Gonsalves. To avoid confusion, we will use the same spelling the judge used.

a public housing project. The entire incident described lasted only a few minutes.

Approximately forty-five minutes later, Goncalves went to the Area D-4 police station and reported the robbery. He described the male assailant as a twenty-seven to thirty year old black male, six feet tall with a medium build, weighing 170 pounds, and wearing a black cap, blue jeans, and a brown sweatshirt. Goncalves was shown about six books containing photographs of suspects, but was unable to identify his assailants.[2] Goncalves then accompanied a police officer to view a group of potential suspects. Once again, Goncalves did not make an identification.

The day following the incident, four police officers arrived at Goncalves's place of employment at approximately 5 P.M. They told Goncalves that they wanted him to view two suspects. Goncalves accompanied the officers. When they arrived at the location where the suspects were being held, Goncalves saw a group of six to eight people. Only one adult black male, the defendant, was present and a female with a limp was the only adult white female present. The two suspects were being "detained" by police officers but they were not handcuffed. The defendant and the woman were brought forward a few steps by the officers. Goncalves then identified the pair as his assailants. Goncalves based his identification in part on the fact that the clothing worn by the suspects was the same as that worn by his assailants.

The defendant possessed several characteristics that did not match Goncalves's initial description of the male assailant. A booking photograph taken of the defendant at the time of his arrest, the day after the incident, shows that the defendant had a moustache. Yet Goncalves had never mentioned that the male assailant had a moustache. The booking sheet indicates that the defendant is thirty-seven years old and weighs 220 pounds, whereas Goncalves had described a man of approximately twenty-seven years in age, weighing

---

[2]The record indicates that Goncalves looked at approximately 1,500 photographs while he was at the police station.

170 pounds, with a medium build. Finally, at the time of the hearing on the motion to suppress the defendant was missing several front teeth. When describing his assailants to the police, Goncalves did not tell them that the male assailant had missing teeth.

The judge ruled that Goncalves's identification of the defendant was tainted because it was made at an unnecessarily suggestive showup. The evidence presented at the motion hearing supports this conclusion. Although one-on-one confrontations are not per se excludable, they are disfavored because of their inherently suggestive nature. See *Commonwealth* v. *Howell*, 394 Mass. 654, 660 (1985); *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). Showups have been permitted when conducted in the immediate aftermath of a crime and in exigent circumstances. *Commonwealth* v. *Barnett*, *supra* at 92. See *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967). The showup employed by the police in this case was conducted eighteen hours after the crime. It took place in the area of the housing project where Goncalves had seen his assailants drive the previous night; the defendant was brought forward from the group before Goncalves positively identified him; and the defendant was wearing clothes similar to those worn by the male assailant. Based on these facts, the judge was warranted in concluding that the identification procedure was unnecessarily suggestive.

Although the judge found the identification procedure unnecessarily suggestive, he found that the identification was admissible because it was reliable.[8] In so doing, the judge relied on Appeals Court decisions which have adopted the "reliability test," set forth in *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), regarding the admissibility of identifications

---

[8]In concluding that the identification of the defendant was reliable, the judge cited Goncalves's good opportunity to view his assailants, his certainty in identifying the defendant, and his rejection of hundreds of other photographs as well as suspects presented to him prior to his identification of the defendant.

obtained through unnecessarily suggestive procedures.[4] See *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574 (1984). See also *Commonwealth* v. *Riley*, 26 Mass. App. Ct. 550, 553-554 (1988); *Commonwealth* v. *Laaman*, 25 Mass. App. Ct. 354, 362, cert. denied, 488 U.S. 834 (1988); *Commonwealth* v. *Jones*, 25 Mass. App. Ct. 55, 60 (1987); *Commonwealth* v. *Key*, 19 Mass. App. Ct. 234 (1985); *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. 230 (1978).

Although the Appeals Court has applied the due process analysis set forth in the *Brathwaite* case, this court has never accepted the reasoning in *Brathwaite* as an accurate interpretation of the due process requirements of art. 12 of the Declaration of Rights of the Massachusetts Constitution.[5] Whether we should embrace *Brathwaite*, as have the majority of other States, is a question we have left open. *Commonwealth* v. *Melvin*, 399 Mass. 201, 205 (1987). *Commonwealth* v. *Correia*, 381 Mass. 65, 81 (1980). *Commonwealth* v. *Venios*, 378 Mass. 24, 26-28 (1979). In cases involving an unnecessarily suggestive identification, we have adhered to

---

[4]This test, developed in *Neil* v. *Biggers*, 409 U.S. 188 (1972), and *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), is sometimes also referred to as the "totality" test or the "totality of the circumstances" test.

[5]States may decline to follow *Brathwaite* and its predecessor, *Neil* v. *Biggers*, *supra*, and adopt more stringent due process requirements under their own Constitutions or through their own Legislatures. *Manson* v. *Brathwaite*, *supra* at 118 (Stevens, J., concurring). *Id.* at 128-129 (Marshall, J., dissenting). See *Commonwealth* v. *Henderson*, 411 Mass. 309, 311 (1991); *State* v. *Leclair*, 118 N.H. 214, 218 (1978). See also Note, Twenty-Years of Diminishing Protection: A Proposal To Return To the *Wade* Trilogy's Standards, 15 Hofstra L. Rev. 583, 596 (1987); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).

New York, for example, has interpreted its State Constitution as requiring the use of the pre-*Brathwaite* per se exclusion standard. *People* v. *Adams*, 53 N.Y.2d 241 (1981). See *People* v. *Edmonson*, 75 N.Y.2d 672, cert. denied, 498 U.S. 1001 (1990); *People* v. *Sapp*, 98 A.D.2d 784 (N.Y. 1983); *People* v. *Tatum*, 192 Misc. 2d 196 (N.Y. Sup. Ct. 1985). In addition, Utah, while applying a "reliability" test, does not explicitly follow *Brathwaite* and *Biggers* because it has concluded that the Supreme Court's test does not provide adequate protection against mistaken identifications. See *State* v. *Ramirez*, 817 P.2d 774 (Utah 1991); *State* v. *Long*, 721 P.2d 483 (Utah 1986).

the stricter rule of per se exclusion previously followed by the Supreme Court and first set forth in the *Wade-Gilbert-Stovall* trilogy[6] of cases. *Commonwealth* v. *Botelho,* 369 Mass. 860, 865-869 (1976). See *Commonwealth* v. *Dinkins,* 415 Mass. 715, 720-721 (1993); *Commonwealth* v. *Smith,* 414 Mass. 437, 442-443 (1992); *Commonwealth* v. *Thornley,* 406 Mass. 96, 98-99 (1989); *Commonwealth* v. *Melvin, supra* at 205.

The rule of per se exclusion, set forth in *Commonwealth* v. *Botelho, supra,*[7] states that the defendant bears the burden of demonstrating, by a preponderance of the evidence, that the "witness was subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process." *Id.* at 866. If this is established, then the prosecution is barred from introducing that particular confrontation in evidence at trial. *Id.*[8] As for other identifications the witness may have made of the defendant, "the prosecution is limited to introducing at trial only such identifications by the witness as are shown at the suppression hearing not to be the product of the suggestive confrontation — the later identifications, to be usable, must have an independent source." *Id.* The prosecution must demonstrate the existence of an independent source by "clear and convincing evidence." *Id.* at 868.

"In deciding whether a particular confrontation was unnecessarily suggestive, the judge is to consider 'the totality of

---

[6]See *United States* v. *Wade,* 388 U.S. 218 (1967); *Gilbert* v. *California,* 388 U.S. 263 (1967); *Stovall* v. *Denno,* 388 U.S. 293 (1967). See also *Simmons* v. *United States,* 390 U.S. 377 (1968).

[7]The rule of per se exclusion was also followed in Massachusetts prior to *Commonwealth* v. *Botelho,* 369 Mass. 860 (1976), in cases decided subsequent to the Supreme Court's *Wade* trilogy. See *Commonwealth* v. *Ferguson,* 365 Mass. 1, 6-7 (1974); *Commonwealth* v. *Ross,* 361 Mass. 665, 670-676 (1972), judgment vacated on other grounds, 410 U.S. 901, aff'd on remand, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973); *Commonwealth* v. *McGrath,* 361 Mass. 431, 434-438 (1972).

[8]"It would be open to the defendant, however, if he chose, to attempt to attack and weaken the prosecution's case at trial by introducing the suggestive confrontation and arguing to the trier that it did corrupt any later identifications including the in-court identification." *Commonwealth* v. *Botelho, supra* at 866.

the circumstances surrounding it' (*Stovall*, 388 U.S. at 302)." *Commonwealth* v. *Botelho, supra* at 867. Additionally, in determining whether a separate identification has a source independent of the unnecessarily suggestive identification, the judge considers the following factors: "(1) The extent of the witness' opportunity to observe the defendant at the time of the crime; prior errors, if any, (2) in description, (3) in identifying another person or (4) in failing to identify the defendant; (5) the receipt of other suggestions, and (6) the lapse of time between the crime and the identification." *Id.* at 869, quoting *Commonwealth* v. *Ross*, 361 Mass. 665, 671 n.2 (1972), judgment vacated on other grounds, 410 U.S. 901, aff'd on remand, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973).

The Commonwealth now urges us to abandon the per se rule of exclusion and, like the Appeals Court, follow the reliability test of *Brathwaite*. Under the "reliability" test, if a defendant demonstrates that an identification was unnecessarily suggestive, evidence of that identification is not per se excluded. *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972). Instead, the court must determine whether the identification was, under the "totality of the circumstances," nevertheless reliable. *Id.* at 198-199. In determining whether an identification was reliable, and thus there was no "substantial likelihood of irreparable misidentification," the court must examine several factors. *Id.* at 199, 201. *Manson* v. *Brathwaite, supra* at 106. These factors are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil* v. *Biggers, supra* at 199-200. *Manson* v. *Brathwaite, supra* at 114. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.*

The case at bar presents us with the opportunity to establish our position with regard to the *Brathwaite* decision. We have carefully considered the matter and, for the reasons set

forth, we conclude that we cannot accept *Brathwaite* as satisfying the requirements of art. 12. We conclude that art. 12 requires the application of the stricter per se approach described in *Commonwealth* v. *Botelho, supra.*

Our past resistance to the so-called reliability test reflects this court's concern that the dangers present whenever eyewitness evidence is introduced against an accused require the utmost protection against mistaken identifications. There is no question that the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primary cause of erroneous convictions. See Gross, Loss of Innocence: Eyewitness Identification and Proof of Guilt, 16 J. Legal Stud. 395, 396 (1987); Note, Twenty-Years of Diminishing Protection: A Proposal to Return to the *Wade* Trilogy's Standards, 15 Hofstra L. Rev. 583, 605-606 (1987); Grossman, Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet its Own Criteria, 11 U. Balt. L. Rev. 53, 65 (1981). See also *Wright* v. *United States*, 404 F.2d 1256, 1262 (D.C. Cir. 1968) (Bazelon, J., dissenting) ("Since mistaken identifications are probably the greatest cause of erroneous convictions, we must require the fairest identification procedures available under the circumstances. With the stakes so high, due process does not permit second best" [footnote omitted]). Compounding this problem is the tendency of juries to be unduly receptive to eyewitness evidence. *Manson* v. *Brathwaite, supra* at 120 (Marshall, J., dissenting). See *State* v. *Long,* 721 P.2d 483, 490-491 (Utah 1986); Grossman, *supra* at 65. We have stated that "[t]he law has not taken the position that a jury can be relied on to discount the value of an identification by a proper appraisal of the unsatisfactory circumstances in which it may have been made. On the contrary, this court, like others, has read the Constitution to require that where the conditions are shown to have been highly and unnecessarily suggestive, the identification should not be brought to the attention of the jury." *Commonwealth* v. *Marini*, 375 Mass. 510, 519 (1978).

These concerns were at the heart of the *Wade* trilogy of cases. The *Wade* Court acknowledged that "the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States* v. *Wade*, 388 U.S. 218, 228 (1967). In declaring that the accused has a right to counsel at a postindictment lineup, the Court recognized that the presence of counsel was necessary because "[t]he trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness — 'that's the man.'" *Id.* at 235-236. The "reliability test" is unacceptable because it provides little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications and, ultimately, from wrongful convictions.

The *Brathwaite* Court examined three primary "interests" before holding that the per se rule should be abandoned in favor of the less protective "reliability" test. The first of these was the concern regarding the dangers presented by eyewitness evidence. *Manson* v. *Brathwaite, supra* at 112. The Court acknowledged that a witness's recollection "can be distorted easily by the circumstances or by later actions of the police." *Id.* While the per se approach addresses this concern, the Court stated, it "goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant." *Id.*

We believe that Justice Marshall, dissenting in *Brathwaite*, had a more realistic view of the trial process when he stated:

"this conclusion totally ignores the lessons of *Wade*. The dangers of mistaken identification are, as *Stovall* held, simply too great to permit unnecessarily suggestive identifications. Neither *Biggers* nor the Court's

opinion today points to any contrary empirical evidence. Studies since *Wade* have only reinforced the validity of its assessment of the dangers of identification testimony." *Id.* at 125 (Marshall, J., dissenting).

Indeed, studies conducted by psychologists and legal researchers since *Brathwaite* have confirmed that eyewitness testimony is often hopelessly unreliable.[9] Permitting the admission of an identification obtained through unnecessarily suggestive procedures can only serve to exacerbate this problem. Furthermore, contrary to the *Brathwaite* Court's unsubstantiated claim, the per se approach does not keep relevant and reliable identification evidence from the jury. Subsequent identifications shown to come from a source independent of the suggestive identification remain admissible under the per se approach. *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976). See *People* v. *Adams*, 53 N.Y.2d 241, 251 (1981). The per se approach excludes only the unnecessarily suggestive identification and subsequent tainted identifications. *Id.* As stated earlier, the court examines five factors in determining whether there was an independent source for subsequent identifications by the witness of the defendant. If, for example, the prosecution is able to demonstrate that the witness got a good look at his assailant and his initial description matches a description of the defendant, the court may conclude that there was an independent source and may admit evidence of any identification subsequent to the unnecessarily suggestive one.

The *Brathwaite* Court also discussed the public interest in deterring police from using identification procedures which are unnecessarily suggestive. The Court acknowledged that

[9]See, e.g., *State* v. *Long*, 721 P.2d 483, 488-491 (Utah 1986); Grossman, *supra* at 70-96; Gross, *supra* at 408-432; N. Sobel, Eyewitness Identification § 3.3(a) (Supp. 1992); L. Taylor, Eyewitness Identification (1982); Jonakait, Reliable Identification: Could the Supreme Court Tell in *Manson* v. *Brathwaite?*, 52 U. Colo. L. Rev. 511 (1981); E.F. Loftus, Eyewitness Testimony (1979); Wells & E.F. Loftus, Eyewitness Testimony: Psychological Perspectives (1984); W.R. LaFave & J.H. Israel, Criminal Procedure §§ 7.1, 7.4 (1984 ed. & 1991 Supp.)

the per se rule is superior in promoting that interest because it provides greater deterrence against police misconduct. The Court nevertheless concluded: "The police will guard against unnecessarily suggestive procedures under the totality rule, as well as the per se one, for fear that their actions will lead to the exclusion of identifications as unreliable." *Manson* v. *Brathwaite, supra* at 112.

To the contrary, it appears clear to us that the reliability test does little or nothing to discourage police from using suggestive identification procedures. One commentator has noted that "under *Brathwaite*, the showup has flourished, because the totality approach has failed to discourage this practice. As a deterrent to suggestive police practices, the Federal standard is quite weak. Almost any suggestive lineup will still meet reliability standards." Note, Twenty-Years of Diminishing Protection, 15 Hofstra L. Rev. 583, 606 (1987). Indeed, an example of this result is seen in the instant case: the suggestion inherent in the showup procedure that was used to identify the defendant is plain. Furthermore, the showup was unnecessarily suggestive in that it was not conducted immediately after the crime or in exigent circumstances. See *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976). Yet the motion judge permitted the introduction of the identification based on his opinion that the identification was reliable. Rather than deterring unreliable identification procedures, the effect of the *Biggers-Brathwaite* reliability test has been, and would be in this Commonwealth, a message to police that, absent extremely aggravating circumstances, suggestive showups will not result in suppression. Whether or not to use a more fair and accurate identification procedure is, under that test, left to the officer's discretion. See Grossman, *supra* at 60.

Finally, the *Brathwaite* Court considered the impact of the two tests on the administration of justice. It was here that the Court found what it considered to be the most serious drawbacks of the per se approach. However, it is also here, in our view, that the Court erred most. The Court opined: "Since it denies the trier reliable evidence, [the per se ap-

proach] may result, on occasion, in the guilty going free."
*Manson* v. *Brathwaite, supra* at 112. The inverse of this is
probably more accurate: the admission of unnecessarily sug-
gestive identification procedures under the reliability test
would likely result in the innocent being jailed while the
guilty remain free. See *Manson* v. *Brathwaite, supra* at 127
(Marshall, J., dissenting) ("[I]f the police and the public
erroneously conclude, on the basis of an unnecessarily sug-
gestive confrontation, that the right man has been caught
and convicted, the real outlaw must still remain at large").
The *Braithwaite* Court disregards the wisdom of Justice
Harlan when he wrote: "it is far worse to convict an innocent
man than to let a guilty man go free." *In re Winship*, 397
U.S. 358, 372 (1970) (Harlan, J., concurring).

Justice Grimes of the New Hampshire Supreme Court ex-
pressed this concern accurately when he wrote: "The dangers
of misidentification are well known and documented. See
*United States* v. *Wade*, 388 U.S. 288 (1967); *Gilbert* v. *Cali-
fornia*, 388 U.S. 263 (1967); *Stovall* v. *Denno*, 388 U.S.
293 (1967). In these cases the court recognized '[a] major
factor . . . [in] the high incidence of miscarriage of justice
from mistaken identification has been the degree of sugges-
tion inherent in the manner in which the prosecution presents
the suspect to witnesses for pretrial identification.' *United
States* v. *Wade*, 388 U.S. at 288. . . . Considering the com-
plexity of the human mind and the subtle effects of sugges-
tive procedures upon it, a determination that an identification
was unaffected by such procedures must itself be open to
serious question. All things considered, the consequences of
misidentification are so great and the risks so high that it is
questionable if a totality-of-circumstances test provides ei-
ther a sufficient deterrence against the unnecessary use of
one-man showups or a sufficient protection against misiden-
tifications which may result therefrom." *State* v. *Leclair*, 118
N.H. 214, 217-218 (1978).

We note that there are essential policy differences between
other aspects of an exclusionary rule and the rule supporting
the per se exclusion of suggestive identifications and tainted

trial identifications. The New York Court of Appeals summed up these differences in *People* v. *Adams*, 53 N.Y.2d 241, 250-251 (1981), when it stated: "The rule excluding improper showups and evidence derived therefrom is different in both purpose and effect from the exclusionary rule applicable to confessions and the fruits of searches and seizures. In the latter cases generally reliable evidence of guilt is suppressed because it was obtained illegally. Although this serves to deter future violations, it is collateral and essentially at variance with the truthfinding process (see, e.g., *People* v. *McGrath*, 46 N.Y.2d 12 [1978], cert. denied, 440 U.S. 972 [1979]). But the rule excluding improper pretrial identifications bears directly on guilt or innocence. It is designed to reduce the risk that the wrong person will be convicted as a result of suggestive identification procedures employed by the police."

The Court of Appeals continued: "A reliable determination of guilt or innocence is the essence of a criminal trial. A defendant's right to due process would be only theoretical if it did not encompass the need to establish rules to accomplish that end. Permitting the prosecutor to introduce evidence of a suggestive pretrial identification can only increase the risks of convicting the innocent in cases where it has the desired effect of contributing to a conviction. In most instances, where the witness is able to make an untainted identification in court, proof of the suggestive showup only serves to bolster the People's case. However, if the jury finds the in-court identification not entirely convincing it should not be permitted to resolve its doubts by relying on the fact that the witness had identified the defendant on a prior occasion if that identification was made under inherently suggestive circumstances. Similarly, if the witness is unable to identify the defendant at trial the defendant's conviction should not rest solely upon evidence of a pretrial identification made under circumstances which were likely to produce an unreliable result." *Id.* at 251.

Thus, the Court of Appeals concluded: "Excluding evidence of a suggestive showup does not deprive the prosecutor

of reliable evidence of guilt. The witness would still be permitted to identify the defendant in court if that identification is based on an independent source." *Id.*

The reliability approach has the further effect of expanding a reviewing court's powers because it allows the court to examine subjectively the circumstances surrounding the original crime on a case-by-case basis, instead of objectively examining the identification procedures employed by the police. Sherwood, The Erosion of Constitutional Safeguards in the Area of Eyewitness Identification, 30 How. L.J. 439, 457 (1987). See Note, Twenty-Years of Diminishing Protection, 15 Hofstra L.Rev. 583, 592 (1987). "By relying on the probable accuracy of a challenged identification, instead of the necessity for its use, the Court seems to be ascertaining whether the defendant was probably guilty." *Manson* v. *Brathwaite, supra* at 128 (Marshall, J., dissenting).

The reliability test has been widely criticized by commentators,[10] primarily because the test eliminates the protection essential to a fair trial. The reliability test hinders, rather than aids, the fair and just administration of justice by permitting largely unreliable evidence to be admitted directly on the issue of the defendant's guilt or innocence.

This case presents an example of why we should not abandon the per se rule of exclusion and replace it with the reliability test. There is absolutely no evidence that the in-court identification of the defendant was the result of anything independent of the unnecessarily suggestive showup. For example, Goncalves's description of his assailant, given to police just after the incident, did not match the defendant's appearance, in part because the defendant possessed the unique feature of several missing teeth. Regardless of this fact, follow-

---

[10]See, e.g., Sherwood, *supra*, 30 How. L.J. 439 (1987); Rosenberg, Rethinking the Right to Due Process in Connection with Pretrial Identification Procedures: An Analysis and a Proposal, 79 Ky. L.J. 259 (1990); Note, Twenty-Years of Diminishing Protection, 15 Hofstra L. Rev. 583 (1987); Grossman, *supra* at 53. See also N. Sobel, Eyewitness Identification § 3.3(b) (Supp. 1992).

ing the showup Goncalves was able to "remember" that his assailant had missing teeth.[11] Such flimsy evidence should not be permitted at trial. Only a rule of per se exclusion can ensure the continued protection against the danger of mistaken identification and wrongful convictions. Accordingly, we reject *Brathwaite* and affirm our confidence in the *Botelho* approach.

The verdict of guilty is vacated. The judgment of conviction is reversed.

*So ordered.*


NOLAN, J. (dissenting, with whom Lynch, J., joins). For approximately twenty years this court has left open the question whether to follow the *Brathwaite* reliability test. See *Manson* v. *Brathwaite*, 432 U.S. 98 (1977); *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979). At long last, the court has reached the question, only to reject the reliability test, in favor of the per se rule of exclusion. Massachusetts, today, becomes one of only two States to adopt this rule.[1] Virtually every other State which has considered the issue has adopted

---

[11]As noted earlier, Goncalves's original description of the male assailant, given to police on the night of the incident, differed in several respects from the defendant's actual appearance. The defendant weighed 220 pounds, while Goncalves described his assailant as weighing 170 pounds with a medium build. The defendant was thirty-seven years of age while Goncalves described his assailant as between twenty-seven and thirty years old. Finally, the defendant was missing several teeth and had a moustache but Goncalves mentioned neither of these characteristics in his original description.

At the hearing on the motion to suppress, when asked to describe what he remembered about his assailant's appearance, Goncalves testified that he was in his late thirties, weighed about 200 pounds ("maybe more"), and had a large build. Goncalves also "remembered" while testifying that his assailant was missing some of his teeth.

[1]Only New York has adopted the per se exclusionary rule. See *People* v. *Adams*, 53 N.Y.2d 241, 250-252 (1981) (rejecting reliability test and holding that State Constitution requires per se exclusion of unnecessarily suggestive identifications).

the reliability test.[2] We should join the overwhelming major-
ity of States, as well as the Supreme Court of the United

---

[2] See *Proctor v. State,* 424 So. 2d 705, 708-709 (Ala. Crim. App. 1982);
*Holden v. State,* 602 P.2d 452, 455-456 (Alaska 1979); *State v. Bracy,*
145 Ariz. 520, 530-531 (1985), cert. denied, 474 U.S. 1110 (1986); *Chism
v. State,* 312 Ark. 559, 570-571 (1993); *People v. Clark,* 3 Cal. 4th 41,
135-136 (1992), cert. denied, 507 U.S. 993 (1993); *People v. Weller,* 679
P.2d 1077, 1083 (Colo. 1984); *State v. Miller,* 202 Conn. 463, 470 (1987);
*Younger v. State,* 496 A.2d 546, 550 (Del. 1985); *Turner v. United States,*
622 A.2d 667, 672 (D.C. 1993); *Collins v. State,* 626 So. 2d 991, 992
(Fla. Dist. Ct. App. 1993); *Rivers v. State,* 250 Ga. 303, 306-307 (1982);
*State v. Masaniai,* 63 Haw. 354, 362-365 (1981); *State v. Hoisington,* 104
Idaho 153, 161-162 (1989); *People v. Miller,* 254 Ill. App. 3d 997, 1003-
1004 (1993); *Hamlet v. State,* 490 N.E.2d 715, 720 (Ind. 1986); *State v.
Thornton,* 506 N.W.2d 777, 779-780 (Iowa 1993); *State v. Holloman,* 17
Kan. App. 2d 279, 286-287 (1992); *Wilson v. Commonwealth,* 695
S.W.2d 854, 857 (Ky. 1985); *State v. Robinson,* 386 So. 2d 1374, 1377
(La. 1980); *State v. Rolls,* 599 A.2d 421, 423 (Me. 1991); *Green v. State,*
79 Md. App. 506, 513 (1989); *People v. Kurylczyk,* 443 Mich. 289, 306-
309 (1993), cert. denied, 510 U.S. 1058 (1994); *State v. Lambert,* 278
N.W.2d 57, 57 (Minn. 1979) (per curiam); *McNeal v. State,* 405 So. 2d
90, 92-93 (Miss. 1981); *State v. Carter,* 572 S.W.2d 430, 435 (Mo. 1978);
*State v. Johnson,* 207 Mont. 214, 217-219 (1983), cert. denied, 467 U.S.
1215 (1984); *State v. Richard,* 228 Neb. 872, 877-878 (1988); *Gehrke v.
State,* 96 Nev. 581, 583-584 (1980); *State v. Whittey,* 134 N.H. 310, 312-
314 (1991); *State v. Clausell,* 121 N.J. 298, 325-326 (1990); *State v.
Maes,* 100 N.M. 78, 82 (1983); *State v. Richardson,* 328 N.C. 505, 510-
511 (1991); *State v. Packineau,* 423 N.W.2d 148, 149-150 (N.D. 1988);
*State v. Parker,* 53 Ohio. St. 3d 82, 87 (1990); *Sherman v. State,* 675
P.2d 458, 459 (Okla. Crim. App. 1984); *State v. Classen,* 285 Or. 221,
232-233 (1979); *Commonwealth v. Baker,* 531 Pa. 541, 552 (1992); *State
v. Gomes,* 604 A.2d 1249, 1253 (R.I. 1992); *State v. Stewart,* 275 S.C.
447, 450 (1980); *State v. Phinney,* 348 N.W.2d 466, 468-469 (S.D. 1984);
*State v. Short,* 698 S.W.2d 81, 83 (Tenn. Crim. App. 1985); *Jackson v.
State,* 657 S.W.2d 123, 130 (Tex. Crim. App. 1983); *State v. Kasper,* 137
Vt. 184, 192-193 (1979); *Satcher v. Commonwealth,* 244 Va. 220, 252-
254 (1992), cert. denied, 507 U.S. 933 (1993); *State v. Maupin,* 63 Wash.
App. 887, 896-897 (1992); *State v. Woodall,* 182 W. Va. 15, 24 (1989);
*State v. Mosley,* 102 Wis. 2d 636, 652 (1981); *Alberts v. State,* 642 P.2d
447, 450 (Wyo. 1982).

The Supreme Court of Utah, relying on its State Constitution, has de-
veloped its own "reliability" test which differs somewhat from the
*Brathwaite* test. See *State v. Ramirez,* 817 P.2d 774, 778-781 (Utah
1991). The ultimate question to be determined is still, whether, under the
totality of the circumstances, the identification is reliable, however the fac-
tors by which reliability is determined vary slightly from the Federal stan-
dard. *Id.* at 781.

States, in adopting the reliability test for purposes of determining the admissibility of out-of-court identifications obtained through unnecessarily suggestive procedures.

The court concludes, erroneously in my view, that art. 12 of the Declaration of Rights of the Massachusetts Constitution requires exclusion of out-of-court identification evidence, without regard to reliability, whenever it has been obtained through unnecessarily suggestive confrontation procedures. *Ante* at 464-465. Nothing in the Massachusetts Constitution purports to protect a criminal defendant from the admission of reliable identification testimony. Due process is not violated merely because the State employs suggestive identification procedures. Due process is only violated when suggestive procedures create a substantial likelihood of misidentification. See *Neil* v. *Biggers*, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process"). Thus, even if obtained through unnecessarily suggestive procedures, identification evidence possessing a sufficient indicia of reliability should not be excluded. "Unlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest. Thus, considerations urging the exclusion of evidence deriving from a constitutional violation do not bear on the instant problem." *Manson* v. *Brathwaite, supra* at 113 n.13.

The court further concludes that "the 'reliability test' is unacceptable because it provides little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications, and, ultimately, from wrongful convictions." *Ante* at 466. However, under the reliability test, only those identifications possessing a sufficient indicia of reliability will be admitted. Further, imposing a framework of shifting burdens as the Supreme Court of Maine did in *State* v. *Cefalo*, 396 A.2d 233, 238-239 (Me. 1979), will ensure that only those identifications which have a basis independent of the suggestive procedures will be put before the jury. In *State* v. *Cefalo*, the Supreme Court of Maine formulated a framework of shifting burdens of proof for the suppression of

identification testimony. Under that formulation, the defendant must first establish by a preponderance of the evidence that the identification procedure was suggestive. *Id.* If the defendant meets that burden, then the burden shifts to the State to show by clear and convincing evidence that, in the totality of the circumstances, the reliability of the identification outweighs the suggestiveness of the procedure used. *Id.* We have in the past expressed approval of this approach, see *Commonwealth* v. *Venios, supra* at 28, and, in my view, it provides adequate protection against the evils associated with the admission of suggestive identification evidence.

This procedural framework of shifting burdens will also enhance the reliability test's deterrent effect by placing the burden on the State to prove by clear and convincing evidence that an unnecessarily suggestive identification is sufficiently reliable. As the *Cefalo* court stated, "if the police ignore the frequent warnings of this court and continue to use defective confrontation procedures, the State will run the risk of being unable to establish independently the reliability of the identification. This [burden shifting] approach assures that reliable and probative identifications will be admissible, while deterring the police from employing unfair procedures that violate norms of governmental fair play and create the risk of misidentification." (Footnote omitted.) *Id.* at 238.

Implicit in the court's opinion is a distrust of the ability of jurors to discount the value of an identification obtained through suggestive procedures. However, jurors are faced with arguably untrustworthy evidence at many junctures during a trial. Just as they are capable of sifting through a myriad of issues, they are capable of determining the proper weight to be accorded an identification. In fact, after hearing all the evidence pertaining to pretrial identifications, including any evidence of possible suggestiveness, jurors may be better equipped to evaluate the accuracy of a witness's identification. It seems unduly artificial to me to allow jurors to consider in-court identifications without acquainting them

with the origins of those identifications.[3] Moreover, through effective cross-examination and argument, counsel can alert the jury to any factors which raise doubts as to the accuracy of the witness's identification.[4]

Finally, it defies logic to exclude a suggestive out-of-court identification without considering its reliability while at the same time allowing an in-court identification which has a source independent of the tainted procedures. The reliability test serves the same purpose as the independent source test, that is, to determine whether the identification is based on something other than the suggestive procedures.[5] See *People v. Adams*, 53 N.Y.2d 241, 252 (1981) (Cooke, J., concurring) (stating that, under the reliability test, "a suggestive

---

[3]"We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

[4]"It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness — an obvious example being the testimony of witnesses with a bias. . . . Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification — including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." *Manson v. Brathwaite, supra* at 113 n.14, quoting *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C. Cir. 1968) (Leventhal, J., concurring), cert. denied, 394 U.S. 964 (1969).

[5]The reliability factors under the *Brathwaite* test include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Manson v. Brathwaite, supra* at 114-115. The reliability of the identification must then be weighed against the corruptive effects of the suggestive procedures.

The factors to be considered under the independent source test are remarkably similar: (1) the extent of the witness's opportunity to view the criminal at the time of the crime; (2) the accuracy of the witness's description, and any errors in failing to identify the defendant or identifying some other person; (3) whether suggestions were given to the witness regarding identification of the defendant; (4) the level of certainty of the witness; and (5) the length of time between the crime and the identification. *Commonwealth v. Holland*, 410 Mass. 248, 256 (1991).

out-of-court identification is admissible so long as it is not unreliable—i.e., if there was an independent source for the out-of-court identification, it is not constitutionally infirm").

In conclusion, for essentially the reasons stated by the trial judge, I believe that the reliability of the identification outweighed any corruptive effect of the suggestive confrontation. Therefore, I dissent.

GREANEY, J. (dissenting, with whom Lynch, J., joins). I agree with much of what Justice Nolan has said, *ante* at 472, but find it necessary to add a few separate comments. The fact that art. 12 of the Declaration of Rights does not specifically address the issue is not important. This court has the obligation to construe art. 12, in accordance with accepted principles of constitutional interpretation, to decide due process issues in light of evolving needs and concerns.

What is important to me is the fact that forty-seven States have adopted the reliability test to govern the admissibility of identification evidence. The weight of this body of outside law should not be lightly disregarded. The highest court of each of these States was aware of its right to fashion a different test under its State Constitution, but, significantly, each chose not to do so, opting instead for the reliability test. Underlying the choice made by the forty-seven States is tacit recognition of at least the following principles:

First, a criminal trial is meant to be a search for the truth in which the people (as represented by the prosecution) have the right to present reliable evidence tending to prove a defendant's guilt.

Second, since reliability is the linchpin governing the admission of all evidence, identification evidence which is found reliable by a judge, after a careful pretrial inquiry, should not be withheld from the jury.

Third, the jury are capable of sorting out issues of suggestiveness and reliability. It is not logical to deprive them of the antecedents of an in-court identification and to allow

speculation on how a victim or identifying witness came to make his or her in-court identification.

I conclude that the reliability test sufficiently protects a defendant's rights under art. 12, and allows the prosecution, in the protection of society's interests, to present its case on a level playing field.