Fremont-Smith, J.
The defendant, Adam Callahan, has been charged with rape and abuse of a child (c. 265, §23), indecent assault and battery on a child (c. 265, §13B) and assault and battery (c. 265, §13A). The defendant has now moved to exclude the child (M.A.)’s statements relating to penetration, an essential element of rape, on reliability grounds. The defendant has further renewed his motion for dismissal of the charge of rape and abuse of a child which was previously denied by the Court (Rup, J.). For the reasons set forth below, the defendant’s motion in limine to exclude portions of M.A.’s statements is allowed.-, and the renewed motion to dismiss the rape charge is denied.
Background
The alleged victim, M.A., is the son of the defendant’s former woman friend, with whom the defendant lived for approximately one and one half years, until October 1996. Even though the defendant was not his biological father, M.A. called the defendant “Daddy.” M.A. was approximately three years old in October 1996.
In early October 1996, M.A. told his grandmother that Daddy “painted” or “put medicine from his penis on [M.A.’s] butt." M.A. later repeated this statement to the mother. According to the mother’s grand jury testimony, a physical examination of M.A. disclosed no tearing, bruising or injury to M.A.’s rectum. On October 16, 1996, David Edwards, a Department of Social Services investigator, conducted a videotaped interview of M.A. at the District Attorney’s office in Northampton. During the interview, M.A. repeatedly told Edwards that Daddy “painted” or “put medicine on his butt.” Also during the interview, Edwards introduced three anatomically-detailed dolls (dolls) and asked M.A. to demonstrate what his Daddy did to him. After M.A. did this in a manner which seemed to demonstrate penetration of the anus, he was asked by the interviewer whether Daddy had put his penis “on or in his butt,” and M.A. responded “in his butt.”
The use of the dolls and M.A.’s subsequent statements regarding penetration are now the subject of defendant’s two motions.
Discussion
An evidentiary “taint” hearing was held on October 7, 1998 to consider whether the interview techniques used by Edwards — specifically, use of the dolls — were unreasonably suggestive so as to have “tainted” M.A.’s competency to testify or to have “tainted any part of his testimony” the Commonwealth may seek to offer at trial. The pretrial “taint” hearing had been ordered by another judge (Rup, J.) based on the reasoning of a recent Supreme Court of New Jersey case, State v. Michaels, 136 N.J. 299; 642 A.2d 1372, 1374 (1994) (New Jersey Supreme Court determined that a pretrial “taint” hearing was required in child sex abuse cases when, after reviewing the interview of the victim and considering the totality of the circumstances, a court finds there is a substantial likelihood that out-of-court and in-court testimony derived from the child victim is unreliable due to improper interviewing techniques[1]), and Commonwealth v. Allen, 40 Mass.App.Ct. 458, 459-65 (1996). In Allen, the Appeals Court upheld the trial court’s denial of a pretrial “taint” hearing after it applied the Michaels factors to the facts of that case, Allen, supra at 462-63, but declined to decide whether a Michaels-type “taint hearing” procedure should be required as a general matter in Massachusetts. Allen, supra at 462.
Standard of Review
As stated above, in Allen, the Appeals Court held that the facts of that case did not warrant a pretrial “taint” hearing. Id. In this case, however, another judge of this Court (Rup, J.) determined, after an initial hearing, that such a hearing was warranted, so that the questions of burden of proof and what standards to apply must be decided.
First, this Court will look to Michaels for assistance in determining the appropriate burdens and standards of proof. The Michaels court, after analyzing the academic studies and professional guidelines which exist for interviewing victims of child sex abuse, noted the recognized susceptibility of children to suggestive techniques, and concluded that the question was analogous to one in which the reliability of an in-court identification is challenged due to suggestive pre-trial identification procedures. The court further noted that, in both cases, as with all evidence, “... reliability is the linchpin in determining admissibility,” and adopted the same procedure as is used when unduly suggestive procedures regarding identification are alleged. Michaels, supra at 1380, citing Manson v. Brathwaite, 432 U.S. 98, 114 (1977). Adopting the reasoning of the New Jersey Supreme Court, this Court will apply, to the proposed testimony at issue here, the procedural and substantive law currently utilized in the Commonwealth in cases involving alleged suggestive pretrial identification procedures.[2]
In Massachusetts, the defendant bears the burden of demonstrating, by a preponderance of the evidence, that the witness was subjected by the state to an identification confrontation that was “unnecessarily suggestive,” and thus offensive to due process. Commonwealth v. Johnson, 420 Mass. 458, 463 (1995). Once the defendant makes this showing, the prosecution is barred from introducing the particular confrontation in evidence at trial and is further limited to introducing at trial only such identifications by the witness as are shown at the suppression hearing by clear and convincing evidence not to be the product of the suggestive confrontation. Id. In other words, the later identifications, to be usable, must have an “in *230 dependent source,” and the Commonwealth must demonstrate, by clear and convincing evidence, the existence of such a source. Id.
Admissibility of Interview Generally
After considering the testimony of defendant’s two expert witnesses[3] and having viewed the relevant portions of the videotaped interview, I find that, with the exception of the use of the anatomically-detailed dolls, the defendant did not show the interview techniques employed by Edwards, the Department of Social Services worker, were “unnecessarily suggestive” so as to be violative of any of the Michaels/Allen criteria, and that the evidence showed that they were not. As demonstrated by the video, the sole interview by him was conducted in a relaxed, friendly atmosphere with the interviewer sitting on the floor with M.A., drawing with crayons. The child’s answers to the questions were spontaneous, and he was not coerced in any way into making statements. Nor were the questions unduly suggestive or leading, or display any bias or preconceived expectations as to what answers should be given. Admittedly, the interviewer was persistent in returning M.A. to the subject of the alleged abuse, but he did not suggest answers to him, try to change M.A.’s answers once given, or threaten, cajole or bribe the child. Indeed, M.A. was permitted to leave the interview room a number of times to visit with his mother, who sat outside the room. Nor, at the evidentiary hearing, did the defendant’s expert witness opine that the interview techniques were in anyway coercive or “unreasonably suggestive,” with the possible exception of the interviewer’s use of anatomically-detailed dolls, discussed below.
Use of Anatomically-Detailed Dolls
Defendant did show, however, by a preponderance of the evidence, that the interviewer’s use of anatomically-detailed dolls may have been suggestive on the issue of defendant’s alleged penetration of M.A.’s anus. Both of defendant’s expert witnesses were in agreement that the general consensus among psychologists and psychiatrists is that, with preschool children (between two and a half and five years old), anatomically-detailed dolls should not be used diagnostically[4] with preschool-age children but should only be used for demonstrative purposes,[5] i.e. after an independent verbal disclosure has already been made. The two major reasons for this distinction are that children between the ages of two and one half and five years are not always able to distinguish fantasy from reality or to think symbolically, so that they are frequently unable to view the dolls as representing themselves and others, rather than viewing them as play toys.
In this case, in view of the expert testimony, the age of the child, the length of the interview and the verbal exchange between Edwards and M.A. as described below and as viewed on videotape, the reliability of M.A.’s statements regarding penetration, initially made only after the introduction of the dolls, is called seriously into question.
As noted above, the video indicates that M.A. had repeatedly stated earlier in the interview that defendant had placed his penis “on [M.A.’s] butt.” Only after his having been asked to demonstrate with dolls what defendant did, did he then, on further inquiry, say that defendant’s penis was placed “in his butt.”[6] As noted, M.A.’s statements concerning the extent of the abuse had, up to that point, been limited to the use of “on” his butt. Although M.A. had previously said Daddy had “hurt” his butt, he had, six times prior to the introduction of the dolls in the interview, stated that Daddy put the medicine “on” not “in” his butt and had never said “in my butt” to anyone prior to the introduction of the dolls and Edwards’ direct question whether it was “in” or “on." The Court finds that the use of the dolls in this manner, to elicit the ensuing damaging statements as to penetration, was unnecessarily suggestive.
Admissibility of subsequent statements
As a result of the suggestive use of the anatomically-detailed dolls, any testimony which can be considered the product of the use of the dolls must be excluded from use at trial unless the Commonwealth proves, by clear and convincing evidence, that M.A.’s statements regarding penetration following the introduction of the dolls had a source independent of the original suggestive confrontation. Thus, M.A.’s subsequent testimony referring to penetration will be admissible only if the Court finds, by clear and convincing evidence, that it is wholly independent of the initial suggestive confrontation. See Johnson, supra at 463.
At the pretrial “taint” hearing, the Commonwealth failed to present any evidence to rebut defendant’s prima facie showing that the use of the dolls was suggestive, or to point to any independent source for the subsequent statements regarding penetration so as to render them admissible. Because defendant’s evidence raising a substantial question of suggestiveness remains unrebutted, this Court will suppress so much of M.A.’s subsequent statements as may relate to penetration.
The exclusion of the doll-related testimony does not, however, affect the admissibility of pre-doll interview testimony in which M.A. told Edwards that Daddy had “hurt his butt” with the medicine, or M.A.’s earlier disclosure to his grandmother that the medicine sometimes “hurt” his butt. These statements, which can fairly be considered to provide circumstantial evidence of penetration, will not be suppressed, as they were clearly made prior to any use of the anatomically-detailed dolls and consequently have an “independent source.”
*231 Motion to dismiss rape charge
The defendant has also renewed his motion to dismiss the indictment of rape and abuse of a child, arguing that if the videotaped statements of M.A. regarding penetration are suppressed, the remaining evidence is insufficient to establish the act of penetration. It is true that, as a result of the Court’s above ruling, the only remaining evidence as to penetration consists of M.A.’s statements to his grandmother and to Edwards that the medicine “hurt” his butt. Even in light of the exclusion of the interview testimony as to penetration, however, this Court cannot dismiss the rape indictment since “. . . evidence presented to a grand jury is legally sufficient if it satisfies the less strict probable cause to arrest standard.” Commonwealth v. O’Dell, 392 Mass. 445, 451 (1984); see also “Memorandum of Decision and Order on Defendant’s Motion to Dismiss” in this case, dated May 6, 1998. Whether or not a jury could reasonably infer from the admissible evidence that penetration did occur, is a matter most appropriately addressed by the trial judge on a motion for a directed verdict of acquittal, at the close of the Commonwealth’s case.
The Court rejects defendant’s further suggestion that the use of M.A.’s doll testimony before the grand jury comprised an intentional and knowing use of unreliable evidence. Defendant’s own experts testified only that it was unclear whether the dolls were used improperly, in a diagnostic manner.
Therefore, the renewed motion to dismiss the rape charge is denied.
Scientific Reliability of Use of Anatomically-Detailed Dolls
Defendant has also moved to exclude the use of the dolls as being generally unreliable as scientific evidence. Although two expert witnesses for the defendant testified regarding the scientific reliability of using anatomically-detailed dolls in child sex abuse cases, the testimony did not indicate that there is any scientific consensus that the unreliability of the use of such dolls, even with respect to pre-school children, is unreliable except with respect to their use as a “demonstrative,” rather than as a “diagnostic,” tool. See footnotes 4 and 5, supra. Indeed, one of the experts did not disapprove of the use of such dolls with such children if used “with caution” and for a “demonstrative” purpose. Both the experts did, however, disapprove of their use with such children in a “diagnostic” way, and one of them raised a question as to whether the dolls may have been used diagnostically at this particular interview, stating that the video was “unclear” in that respect.
As the Court has concluded that there is a substantial likelihood that the dolls were used diagnostically and thus in an unduly suggestive manner at this particular interview, the Court need not address the question whether, as a general rule, the use of anatomically-detailed dolls in child sex abuse cases is scientifically unreliable and whether testimony based on such use should be generally excluded, under the criteria of Commonwealth v. Lanigan, 419 Mass. 15 (1994), and Commonwealth v. Sands, 424 Mass. 184, 185 (1997). Although a number of Massachusetts cases have referred to the use of such dolls in child sex abuse cases without disapproval, no case has been called to the Court’s attention where the use of such dolls has been challenged under the Lanigan criteria (see cases collected in defendant’s “Memorandum in Support of Motion to Dismiss," p. 11). This is a subject on which the Court, on the evidence presented here, has no basis for an opinion, one way or the other, and need not decide.
ORDER
It is therefore ORDERED that defendant’s motion in limine to exclude the anatomically-detailed doll testimony and the resultant statements of M.A. relating to penetration, be ALLOWED, and that defendant’s motion to dismiss the rape charge, be DENIED.

There are nine factors the Michaels court found sufficient to justify a pretrial “taint” hearing and to be considered, if a hearing is held, in determining whether a child’s testimony is “tainted” and should be suppressed: a) absence of spontaneous recall; b) interviewer bias against defendant, for a preconceived idea of what the child should be disclosing; c) repeated leading questions; d) multiple interviews; e) incessant questioning; f) vilification of defendant; g) ongoing contact with peers and references to their statements; h) use of threats, bribes and cajoling; and i) failure to videotape or otherwise document the initial interview sessions. See Michaels, supra at 1377.

New Jersey courts currently apply the U.S. Supreme Court’s Manson-Brathwaite approach to determining the reliability and admissibility of proffered in-court testimony based on unduly suggestive identification procedures. See generally Michaels, supra. The SJC has rejected this approach and instead embraced the stricter “per se exclusion” rule as outlined in Commonwealth v. Botelho, 369 Mass. 860 865-69 (1976). See Commonwealth v. Johnson, 420 Mass. 458, 465 (1995). Thus, the Johnson/Botelho standards are utilized in this case.

Dr. Robin Deutsch, psychologist and Director of Training of the Children and the Law Program at the Massachusetts General Hospital, Boston, MA (January 28, 1998); Lois Oberlander, Ph.D., Assistant Professor of Psychiatry at the University of Massachusetts Medical Center, Worcester, MA (October 7, 1998).

Diagnostic use: dolls employed as a standardized tool whose use, if the requisite criteria were met, would “lead to a finding,” see Deutsch, at 15.

Demonstrative use: dolls used as a “prop” to help a child communicate and demonstrate after a verbal disclosure of abuse has already been made. Id.

At the time of the interview, M.A. was three and one half years old. The interview lasted approximately one hour. The anatomically-detailed dolls were introduced as toys about halfway through the interview. Approximately fifteen minutes later, Edwards asked M.A. to demonstrate with the dolls, later saying, “I want you to show me where on your butt — where your daddy hurts you, how your daddy hurts you on your butt, if you can . . .” Edwards and M.A. then proceeded to explore the dolls’ anatomy. A few minutes later Edwards again *232 unsuccessfully attempted to have M.A. demonstrate the alleged abuse using the dolls. For a number of minutes this type of exchange continued: Edwards would ask M.A. to demonstrate and M.A. would respond with vague, sometimes unintelligible answers. Finally, when M.A. asked to take the mommy doll out of the room to show his mother, Edwards was successful in getting M.A. to demonstrate using the dolls:
Edwards: “Hey, how about if I have one last question and we’ll be all done?”
M.A.: (Unintelligible)
Edwards: One more question, please? And we’ll be all done. Then you can help me get the dolls dressed and we’ll show — let’s (inaudible) the dolls dressed. Come on, let’s dress them, because they’re going to get cold out there.
M.A.: (Unintelligible)
Edwards: But I wanted you to show me, before you dress them, real quickly show me how the daddy puts the medicine on the boy.
M.A.: What?
Edwards: Can you show me how the daddy puts the medicine on the boy?
M.A.: Yeah.
Edwards: Go ahead, show me with the dolls. I’ll hold that for you, I’ll hold it. Show me with the — I’ll hold it for you. Show me with the dolls, how the daddy puts the medicine on the boy.
M.A.: This boy (unintelligible), Daddy (unintelligible).
Edwards: Okay, this one’s the boy and this one’s the daddy. So you show me — I’ll hold that doll — you show me how the daddy puts the medicine on the boy. Go ahead.
M.A.: Nobody. I think — I know. So the daddy does paint medicine on his butt like that.
Edwards: Like that. Oh.
M.A.: Oh, the daddy did.
Edwards: Daddy did.
M.A.: Yeah.
Edwards then posed additional detailed questions to M.A., such as the color of the medicine and what happened to Daddy’s penis when he painted medicine on the boy’s butt, but M.A. refused to answer and instead asked to dress the doll. Edwards told M.A. to dress the dolls, then left the room. When Edwards returned, the first explicit disclosure regarding penetration was made:
Edwards: While you’re getting them dressed, you showed me that Daddy’s penis, how he painted the medicine on the boy?
M.A.: Yeah.
Edwards: Did Daddy’s penis go in the boy’s butt or on—
M.A.: In.
Edwards: —the boy’s butt?
M.A.: Yeah.
As noted, M.A.’s statements concerning the extent of the abuse had, up to that point, been limited to the use of “on” his butt. Although M.A. had previously said Daddy had “hurt” his butt, he had, six times prior to the introduction of the dolls in the interview, stated that Daddy put the medicine “on” not “in” his butt and had never said “in my butt” to anyone prior to the introduction of the dolls and Edwards’ direct question whether it was “in” or “on.”