COMMONWEALTH *vs.* DEAN M. HOLLAND.

Middlesex. February 6, 1991. - May 23, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Identification. Evidence,* Identification, Photograph, Consciousness of guilt, Relevancy and materiality, Admissions and confessions. *Due Process of Law,* Identification.

There was no error in the denial of a defendant's pretrial motion to suppress either with regard to a victim's initial out-of-court selection of the defendant's photograph from an array of sixteen, or her subsequent photographic and in-court identifications of the defendant where, in the totality of the circumstances attending the initial out-of-court identification, the judge was warranted in concluding that the police procedures were not improperly suggestive and where, even if the initial identification had been constitutionally suggestive, the subsequent photographic and in-court identifications would still be admissible, because the record supported the judge's finding that they resulted from the victim's independent observations of the defendant at the time of the crime. [250-256]

At a criminal trial admission of testimony by a police officer that he had requested the defendant voluntarily to submit to a lineup was harmless error in the circumstances. [256-261]

INDICTMENTS found and returned in the Superior Court Department on October 26, 1989.

A pretrial motion to suppress evidence was heard by *J. Harold Flannery,* J., and the cases were tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for the defendant.

*Patricia M. Darrigo,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant, Dean M. Holland, appeals from his convictions of assault with intent to rape, and indecent assault and battery on a person over fourteen years.[1] He asserts that the trial judge erred in (1) the admission of out-of-court photographic identifications and an in-court identification that he claims resulted from unnecessarily suggestive police procedures; and (2) the admission of testimony that a police detective requested the defendant voluntarily to submit to a lineup. We transferred the case to this court on our own motion. We find no error and affirm the convictions.

There was evidence from which the jury could find the following facts. The then nineteen year old victim worked evenings at a shoe store in Watertown. She walked home from work by the same route every evening. The route took her down Elm Street, through a mixed business and residential area. On August 7, 1989, she left work at her usual time of about 9:30 P.M. As she walked down Elm Street, a man came out from the fenced-in parking lot of the Atlantic Battery Company and grabbed her from behind, covering her mouth. As he dragged her into the parking lot of the Atlantic Battery Company, she noticed that the man was completely naked. As he was dragging her, he punched the victim in the back of the head and the back of the neck several times. She bit the man's hand so that he let go of her mouth, and she started screaming, continuing despite his threats to hit her again. Once inside the parking lot, the man threw the victim to the ground so that she landed on her back. He stood over her, straddling her with his legs spread over her knees, and grabbed at her thighs, trying to pull her pants down. The parking lot was well lit by streetlights shining into it from Elm Street, and the victim could see the man's entire front clearly. She was holding onto her pants at the waistband. She said "No," and tried to convince the man that she had her period, and that someone was walking right behind her. The man finally gave up trying to pull down her pants and,

---

[1] A third conviction of assault and battery was placed on file with the defendant's consent.

while grasping his penis and holding it out to her, he ordered her to "suck it." The victim refused and was able to get up and run away to a nearby store, where the police were called. She then went to the hospital, where she was treated for cuts and bruises, including large bruises on the back of her head and neck.

Immediately after receiving the call about the assault, the police searched the area around Elm Street for about forty-five minutes, and found no suspect. A detective was aware that someone lived in what was called the Zorak Building, located across the street from the Atlantic Battery parking lot on the other side of Elm Street. He called the son of the building's owner, who awakened the man, Dean Holland, an employee of his father who worked as well as lived in the building.[2] When Holland came downstairs to talk to the police, he was wearing boxer shorts, and had his hair pulled back in a tight ponytail so that it appeared short. He had a moustache and was pale-skinned.

I. *Photographic identifications.* After her release from the hospital, the victim went to the Watertown police station. There she described her attacker as very pale, thirty to thirty-five years old, stocky, with a pot-belly, and with very short, reddish-brown hair, and a reddish-brown moustache. She reviewed three to six books of photographs of white males of approximately the same age. Each book contained between twenty and sixty photographs. One photograph of the defendant, depicting him with long, full hair and a moustache, was included among these, in book "2-D." The victim did not select the defendant's photograph at this time. She did, however, pick out a photograph of another man who she said was not her attacker but resembled him. The photograph depicted a fat-faced man with reddish-brown hair, moustache, beard, and glasses.

---

[2] A detective wrote in his police report and testified that, when he asked the owner's son to describe Holland's condition when the son found him in bed, the son stated that Holland was totally naked. The owner's son testified at trial that Holland was wearing boxer shorts when the son found him in bed.

The next morning, the victim returned to the police station and reviewed another book or two, containing fifty to eighty photographs of white males. These books did not contain the defendant's photograph. The victim selected a photograph of a second man who she said was also not her attacker, but bore an eighty percent resemblance to him. This photograph depicted another fat-faced man with reddish-brown hair and moustache.[3]

That same afternoon, on August 8, 1989, a detective brought to the victim's home a book with four pages, containing sixteen photographs, all from the same book "2-D" which she had reviewed the night of August 7. The defendant's photograph was the first of four on the first page of the book. The detective told the victim to "[c]oncentrate on eyes, nose, and mouth because those things don't change," and to block out all other things such as moustaches, hair, and clothing. After looking at all the pages, she selected the photograph of the defendant and told the detective that she was very sure that it was her attacker except that the person in the photograph "had really long, . . . puffy hair". She said that she would be "very sure that it was him, 95 percent sure," if his hair had been short or "pulled back."

After the attack, the victim was driven back and forth to work, taking the same route she had walked, past the Atlantic Battery parking lot on one side and the Zorak Building on the other side of Elm Street. On her way to work on September 3, 1989, a bright sunny day, the victim noticed the defendant standing in the doorway of the Zorak Building, directly across the street from the scene of the assault. She could see his face, his moustache, and the color of his hair. His hair was pulled back and appeared short. She recognized him as the man who had attacked her. She was also aware that he was the man in the picture she had selected. The following Wednesday, September 6, while on her way to

---

[3]The police interviewed the man depicted in this photograph. They found he had an alibi for the night of the crime, and his body had numerous tattoos.

work, she saw her attacker again, sitting in the doorway of the Zorak Building. She called the police station and reported that she had seen the man who had attacked her.[4]

The victim then went to the police station, where she was shown an array of eight photographs, all of which she had viewed previously on the night of the crime, and which had also been included in the array of sixteen which she had viewed on the afternoon of August 8. The victim selected the same photograph of the defendant she had selected previously, the moment she came upon it. This time, she said she was certain it was the man who had attacked her. Subsequent to this final photographic identification, the victim observed the defendant one more time as she walked down Elm Street with a friend. At trial, the victim identified the defendant in court and stated there was no doubt he was the man who had attacked her.

After a pretrial hearing on the defendant's motion to suppress the identification, the judge found that the police procedure was not improperly suggestive and that the victim's identification of the defendant was based on her opportunity to view him at the time of the crime.

The defendant now claims that the victim's selection of his photograph from the array of sixteen on August 8 was the result of unnecessarily suggestive procedures, and that her subsequent positive photographic identification of the defendant in September, 1989, as well as her in-court identification, were inadmissible as the fruits of the allegedly tainted August 8 identification. Specifically, the defendant argues that the showing of the defendant's picture for the second time; its lead location in the array; the detective's direction to concentrate on facial features; and the fact that, according to the defendant, he was the only man in the photographic array with long hair, combined to create an impermissibly pow-

---

[4]The police played no part in the victim's chance sighting of the defendant, and, in fact, had been careful to avoid suggesting that a suspect lived in the area.

erful suggestion that the defendant's photograph was the one to pick.[5]

A photographic identification procedure is constitutionally invalid if the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Commonwealth* v. *Thornley*, 406 Mass. 96, 98 (1989)(*Thornley II*), quoting *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). The initial burden rests on the defendant to show, by a preponderance of the evidence, that, considering the totality of the circumstances attending the particular identification, the witness was subjected by the State to an identification so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law. *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-868 (1976), citing *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967).

If the defendant sustains this burden, the Commonwealth may offer evidence of subsequent identifications only if it can show by clear and convincing evidence that they were not the product of the suggestive identification, but had a source independent of the suggestive identification. See *Thornley II*, *supra* at 99; *Commonwealth* v. *Botelho*, *supra* at 868.[6]

---

[5]The Commonwealth contends the defendant has waived the right to appeal the motion judge's finding, because he did not raise his ground for appeal — the allegedly suggestive procedures of the August 8 identification — at the motion hearing. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987). In this case, trial testimony subsequent to the motion hearing revealed, apparently for the first time, that the detective at the August 8 array suggested that the victim concentrate on features that do not change, rather than things like moustaches or hair. The defendant did not renew his motion to suppress in the light of this evidence. Even if he had, our discussion demonstrates that the result would not have been different.

[6]*Manson* v. *Brathwaite*, 432 U.S. 98, 109-114 (1977), allows use of an out-of-court identification even where suggestive procedures have been employed, provided certain indicia of reliability exist to ensure that the identification is correct. We need not decide whether to adopt this analysis in this case, since we conclude that the procedures were not suggestive. See, e.g., *Commonwealth* v. *Melvin*, 399 Mass. 201, 205 n.6 (1987).

Looking at the totality of the circumstances attending the August 8 identification, the judge would have had an ample basis to conclude that the police did not use any impermissibly suggestive procedures. The argument that the showing of the defendant's photograph for the second time would make the victim more likely to choose it is unconvincing where all the other photographs in the array had also been seen previously by the victim, and the defendant's photograph had not been singled out in any manner in the previous viewing. This is not a case where a defendant's photograph was the only one duplicated in one or more arrays; but even in those cases, such duplication has not been held sufficient, by itself, to compel exclusion of the resulting identification. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 169-170 (1984), and cases therein collected.

The victim explained that she did not select the defendant's photograph from the large number shown her on the night of August 7 because, at the time, she was looking mainly for people with short hair and she passed over anyone with long hair. In light of this explanation, her failure to pick the defendant's photograph from the initial array of approximately 120 to 360 photographs has little significance. Cf. *Commonwealth* v. *Correia*, 381 Mass. 65, 68, 72-73 (1980); *Commonwealth* v. *Paszko, supra* at 171; *Commonwealth* v. *LaPierre*, 10 Mass. App. Ct. 641, 644 (1980).

The detective's direction to the victim to concentrate on facial features "that don't change" while looking at the four pages of photographs was a commonsense suggestion of general application. Despite the defendant's claim that the suggestion "must have telegraphed to [the victim] the message that something changeable such as hair was the key to making an identification," it did not target any one particular photograph or create a likelihood of misidentification. Cf. *Commonwealth* v. *Correia, supra* at 72 (detective's comment that witness should look carefully because robbers often wore disguises, and his action in pointing to two pictures of defendant as an example, was made in good faith as general advice, and he was not attempting to accentuate the defend-

ant although defendant was only person whose pictures appeared in array both in disguise and without). The fact that the photograph was the first one on the first page does not compel a different conclusion.

In a related point, the defendant's claim that he was the only man in the array depicted with long hair is not accurate: many of the men pictured in the array had long hair, of varying styles. Although the defendant's hair may have been the fullest, that was not enough to render the array impermissibly suggestive, especially where it was contrary to, rather than consistent with, the description of the attacker. Cf. *Commonwealth* v. *Napolitano*, 378 Mass. 599, 603 (1979) (police not required to limit array to pictures of heavy men with beards, and array was fair where only three of forty-four photographs depicted heavy men with scraggly beards, a description of the assailant). The victim's statement that she would be more certain it was her attacker if she could see him with short hair indicates she selected the defendant's photograph not because of the hair, but in spite of it. Cf. *Commonwealth* v. *Melvin*, 399 Mass. 201, 206-207 n.10 (1987) (although photograph of defendant was only one where arm was in sling and witness had seen intruder fall on his shoulder, identification sustained where victim did not select the photograph on that basis); *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976) (where defendant was only one in photographic array wearing ski cap, and robber had worn a ski cap, identification admissible where witness testified he was not looking for a hat when he examined the pictures). The victim's qualification of the identification by stating she could not be sure without seeing the defendant with short hair also supports the conclusion that the conduct of the police was without significant effect. See *Commonwealth* v. *Paszko*, *supra* at 171; *Commonwealth* v. *Correia*, *supra* at 79; *Commonwealth* v. *Mayo*, 21 Mass. App. Ct. 212, 217 (1985).

That the victim previously selected two other photographs does not render her subsequent identification of the defendant suspect, where she clearly qualified her selections, stating

that neither of the men depicted was her attacker, but merely resembled him in some respects. Cf. *Commonwealth v. Paszko, supra.* The defendant's contention that those men did not resemble the defendant at all is contradicted by the record.[7]

Even if the August 8 identification had been unconstitutionally suggestive, the subsequent photographic and in-court identifications would still be admissible, because the record amply supports the judge's finding that they resulted from the victim's independent observations of the defendant at the time of the crime. See *Commonwealth v. Botelho,* 369 Mass. 860, 868 (1976). The following factors are to be considered in determining whether there was an independent source: (1) the extent of the witness's opportunity to view the criminal at the time of the crime; (2) the accuracy of the witness's description, and any errors in failing to identify the defendant or identifying some other person; (3) whether suggestions were given to the witness regarding identification of the defendant; (4) the level of certainty of the witness; (5) the length of time between the crime and the identification. See *Thornley II,* 406 Mass. 96, 101 (1989); *Commonwealth v. Thornley,* 400 Mass. 355, 364 (1987) (*Thornley I*); *Commonwealth v. Mobley,* 369 Mass. 892, 896 (1976).

In this case, the victim had an opportunity to observe her assailant close-up and face-to-face while he stood over her for some time. The parking lot where the assault took place was well lit by the nearby street lights. The victim's description of her attacker remained consistent from the start. Even the discrepancy between her description of her attacker as short-haired and the defendant's long hair proved not to be an inconsistency, because of the manner in which the defendant wore his hair.

II. *Testimony on request to submit to lineup.* On the morning of August 9, 1989, a detective again visited the defendant at the Zorak Building. At a pretrial voir dire hear-

---

[7]A resemblance is visible in the shape of the nose, the downturned moustaches and mouths, and the heavy-lidded eyes.

ing, defense counsel objected to the proposed admission of
the conversation that ensued, because it included testimony
that the detective requested the defendant to submit to a
lineup.[8] The judge ruled that the detective should not refer in
his testimony to the defendant's ultimate decision not to co-
operate, stating: "I agree with the defense that a statement
by the detective to that effect risks being misconstrued by the
jury as consciousness of guilt when, in fact, it is simply the
assertion of a right that was his." However, the judge ruled
that the detective would be permitted to testify that he had
asked the defendant to submit to a lineup.

The jury heard the following exchange:

"Q. After advising the defendant of these particular
[Miranda] rights, what, if anything, did you tell
him?

"A. I told the defendant that the victim had picked
out his photo as her assailant.

"Q. Did you tell him anything else at that time?

"A. Yes, I also told him that I would like him to sub-
mit to a line up.

"Q. And did you indicate to him why you wanted him
to submit to a line up?

"A. Yes, I did.

"Q. What did you tell him?

"A. I felt as though that taking a third photo with
him having his hair in a ponytail as he was wear-
ing it at the time, would be unfair to him.

"Q. After you told the defendant all of this, did he say
something back to you?

[Objection overruled]

"A. Yes, he did.

"Q. What did he say to you?

---

[8]The defendant never explicitly refused to submit to a lineup. However,
after asking the detective what would happen if the victim picked him out
of a lineup and being informed that he would be arrested, he told the
detective to get out of his house and not to come back without a warrant.

"A.   At that time he informed me that he was left
      handed and then he asked me if the victim had
      told us that a left handed person had hit her on
      the back of the head.
"Q.   Now, prior to him saying that, had you had any
      discussion at all regarding striking blows to the
      head of the victim?
                [Objection overruled]
"A.   We had never described the assault to him,
      whatsoever."[9]

On cross-examination, the detective testified that it was the
defendant who offered to have his picture taken with his hair
pulled back in a ponytail.

The defendant claims that "[o]nly the densest of jurors
would have failed to infer . . . that the defendant had refused
the request." He claims the Commonwealth's purpose in in-
troducing evidence of the detective's request was so that the
jury would infer the defendant refused, and would further
infer that the refusal communicated an admission or con-
sciousness of guilt. The Miranda warnings given to the de-
fendant would have suggested "that he could cease cooperat-
ing with the police whenever he chose." *Commonwealth* v.
*Rembiszewski*, 363 Mass. 311, 316 (1973). Thus the defend-
ant's refusal to appear in a lineup may have meant no more
than that he did not wish to risk any action that might in-
criminate him or take any such action without first consult-
ing with counsel. If evidence of the refusal is admissible in
evidence, he argues, the defendant was placed in a "Catch-
22" situation in which he would risk incriminating himself no
matter what he did: if he agreed to participate he would risk

---

[9]The detective later admitted that on the previous day, August 8, while
visiting the defendant at his workplace, he had asked to see the defend-
ant's hands, and had questioned him about the cause of swelling on the
knuckles of the his right hand. He also testified, however, that the only
details he told the defendant about the assault were that a girl was at-
tacked across the street from his location and the man was naked.

evidence of an identification,[10] but if he refused to partici-
pate, his refusal could be used as incriminating evidence of
consciousness of guilt.

The defendant contends that forcing him to make such a
choice violates the fairness requirement of the due process
clause of the United States Constitution, as well as art. 12 of
the Massachusetts Declaration of Rights. He also argues that
evidence of his refusal to stand in a lineup was not probative
and was unfairly prejudicial. See *Commonwealth* v. *Nicker-
son*, 386 Mass. 54, 60-61 (1982) (inappropriate to permit
jury to consider defendant's failure, prior to arrest, to come
forward to identify another member of gang as person who
cut victim, where defendant had no duty to report other
member to police and it would not have been "natural" for
him to do so). Furthermore, the defendant argues that the
request to submit to a lineup was introduced for the informa-
tion that could be inferred concerning the knowledge, under-
standing, and thoughts of the defendant — the consciousness
of guilt — and as such was testimonial evidence protected
under art. 12 of the Massachusetts Declaration of Rights.
*Commonwealth* v. *Doe*, 405 Mass. 676, 679 (1989).

The Commonwealth argues that evidence of the detective's
request was relevant and necessary for the jury to understand
that the defendant made a nonresponsive reply evincing con-
sciousness of guilt because he was evading the detective's
question and attempting to determine the strength of the
case against him before deciding whether to submit to the
lineup. (The prosecutor made no attempt at trial to have the
jury speculate as to the defendant's thought processes.)

The request to submit to a lineup could have been ex-
cluded without impairing the jury's ability to understand or
to appreciate the testimony about the rest of the conversa-
tion, which concerned the defendant's knowledge of details of

---

[10]That the defendant may not have had the right under the Fifth
Amendment to the United States Constitution to refuse an order to appear
in a lineup, *United States* v. *Wade*, 388 U.S. 218, 221-222 (1967), is irrel-
evant. Here, the defendant had no duty to submit to a lineup; he was never
ordered to do so but was requested to submit voluntarily.

the assault. However, even if the judge's decision did not go far enough, any error was harmless beyond a reasonable doubt.

The defendant's arguments rest on the assumption that allowing evidence of the request was tantamount to using his refusal to participate in a lineup against the defendant, as an admission of guilt. There is no basis for that assumption. The focus of the detective's testimony was not on the request that the defendant submit to a lineup, but rather on the defendant's inquiry indicating he knew the victim had been hit on the back of the head. The prosecutor came back only to this latter part of the testimony in his examination and closing argument. After eliciting the initial testimony about the conversation, the prosecutor never again referred to the request, and never suggested any inference should be drawn therefrom. Cf. *Chapman* v. *United States*, 547 F.2d 1240, 1249-1250 (5th Cir.), cert. denied, 431 U.S. 908 (1977) (harmless error when single reference to silence was neither repeated nor linked to exculpatory story); *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 316-317 (1973).

Also, if the jury did speculate about whether the defendant agreed to a lineup, the evidence that the *defendant* offered to have a picture taken with his hair pulled back might well have caused them to speculate that he *did* agree. At the least, it would have defused any inference that he refused to participate, and that such refusal was motivated by a consciousness of guilt. In declining the judge's offer to give a cautionary instruction defense counsel impliedly recognized that the jury would not necessarily draw the adverse inferences the defendant claims are so obvious.

Finally, evidence of consciousness of guilt had at best a collateral relationship to the defense's only issue at trial, identification. If such evidence played any role in the jury's decision, the much stronger evidence of consciousness of guilt suggested by the defendant's knowledge of details of the assault overshadowed the evidence about the request to submit to a lineup. Cf. *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696 n.16, 697 (1983), and cases cited therein. See *Common-*

*wealth* v. *Simmonds*, 386 Mass. 234, 240-241 (1982) (comment that defendant knew he had already been picked out in lineup as individual who had raped one party, when defendant was charged with assault with intent to rape, was obscure and would not have appreciably influenced jury); *Commonwealth* v. *Vanetzian*, 350 Mass. 491, 495 (1966) (testimony indicating defendant had met police officer in the past was obscure and relevance to issues being tried tenuous, and it could not have tainted jury's verdict).

For the foregoing reasons, we affirm the convictions.

*Judgments affirmed.*