Fremont-Smith, J.
Background
This case arises out of an alleged gang rape that occurred on the evening of July 13, 1998 on an abandoned railroad track near a trestle that passes over the Charles River in Waltham, Massachusetts.
The nine co-defendants in this case stand indicted on charges of rape, kidnapping, and two counts of assault and battery. The defendants seek to suppress their out-of-court identifications by the alleged rape victim, hereafter, “the rape victim,” and her boyfriend, Robert Gaudet, as well as any future in-court identifications. Defendants challenge the identifications on the grounds that they were either: 1) the result of unduly suggestive procedures or 2) the tainted fruit of an illegal arrest. After sorting through the frequently contradictory testimony of the two alleged victims and of the responding and investigating police officers, the Court, on the basis of all the credible evidence, makes the following findings of fact and rulings of law:
FINDINGS OF FACT
The alleged rape victim had been drinking alcohol much of the day with a male companion, Robert Gaudet, on the railroad tracks near the crime scene. A group of between seven and fifteen Hispanic males had been present all day drinking in the same area. At about 9:30 p.m., a group of Hispanic males attacked the rape victim.[1] Several of the men held her down by the arms and legs while others lined up and took turns raping her vaginally and anally. Meanwhile, others restrained her boyfriend, Robert Gaudet, so he could not come to her assistance. Although at the hearing, the rape victim testified that ten Hispanic men raped her, she had told the person who placed the 911 call and the police who responded, that it was six to seven Hispanic men who had raped her, and subsequently told others that it was up to fifteen men.
After the attack ended, the rape victim and Gaudet were permitted to leave. They fled down the railroad tracks across the trestle and out onto Elm Street. Upon encountering a young boy on a bicycle, the rape victim requested that he call 911, which he did from a pay phone at a nearby store at 10:22 p.m. A police cruiser and ambulance arrived within several minutes. Officer Manganelli, one of the responding offi *328 cers, testified, and the Court finds, that the rape victim told the boy and the police she had been raped by six or seven Hispanic males, on the railroad tracks near the trestle. Gaudet also told the police that the attackers numbered six or seven. They described their attackers to the police only as Hispanic males, but provided no names or further details or description.
Several other police cars responded to the area. A short time later, at approximately 10:30 p.m., police apprehended two Hispanic males who were walking from the railroad track area toward the police. Police also apprehended two other Hispanic males lying on a mattress under a nearby bridge over the Charles River. The suspects were taken to a nearby parking lot, to which the rape victim was transported by ambulance. There, police asked her if she could identify the suspects, whom, they inaccurately informed her, had been apprehended running from the scene. The rape victim testified, and the Court finds, that three of the suspects were handcuffed and lying face down on the ground when she stepped out of the ambulance to identify them. By all accounts, the rape victim was hysterical at this point and ran directly at the defendants after stepping out of the ambulance. The Court credits the rape victim’s testament that she kicked one of the hand-cuffed defendants in the head and face, and that one of the police officers then told her to kick him again. After the suspects were ordered to stand up, the rape victim and Gaudet identified defendants Cruz, Cabrera, and Milian-Lopez as having participated in the rape. After identifying these three suspects, she was then transported to the Waltham Deaconess Hospital where she was treated for injuries sustained in the attack. She was later transported to the Arbor Hospital, a psychiatric facility.
As noted, the Court credits the testimony of the police that two of the suspects were found approximately one hour after the attack walking toward the police, while the two others were found sleeping on a mattress under a nearby bridge which spans the Charles River. The Court does not credit the police testimony that they restrained her from kicking the suspect and did not tell her to kick him again. Although Gaudet testified that he viewed only one of the four suspects, Gutberto Escobar, and identified him as someone who had been present at the railroad tracks but had not participated in the attack, the police testified, and the Court finds, that Gaudet identified the same three suspects as did the rape victim, namely Cruz, Cabrera and Milian-Lopez.[2]
On July 15, 1998, while at the Arbor Hospital, Detective Maher of the Waltham police department showed the rape victim three photographic arrays consisting of eight photos each. From these three arrays, the rape victim identified the same three defendants she had identified on the evening of July 13, 1998, along with two other suspects, defendants Morales and Fuentes. On this occasion, however, the rape victim failed to identify defendants Lopez, Valerio, and Juarez, whose pictures were included among the arrays. Gaudet also viewed the same three photographic arrays on July 15, 1998. He identified defendants Cruz, Cabrera, Milian-Lopez, and Fuentes, but he failed to identify defendants Morales, Lopez, Valerio, and Juarez, whose pictures were in the photo arrays. On July 17, 1998, the rape victim and Gaudet were shown a fourth photographic array consisting of eight photos. From this array they both selected defendant Espina.
That same day, Hispanic males were arraigned at Waltham District Court in connection with the alleged rape. On July 18, 1998, a Boston newspaper published a photograph of eight men seated in the dock in the courtroom, who were identified by name, along with a news article about the incident. The same defendants were also depicted on Channel 5 television. The rape victim saw the photograph and the television depiction sometime prior to July 21,1998 when she viewed the same four photographic arrays for a second time. During this second viewing of the arrays, she identified defendants Juarez, Valerio, and Lopez for the first time, as well as the six defendants she had already identified on prior occasions.[3]
Gaudet failed to identify defendants Lopez and Valerio from the photographic arrays. However, after viewing the arrays, he took out a copy of the newspaper photo of the eight defendants and identified defendants Lopez and Valerio to Detective Scanlon from the newspaper photo as among the attackers. Scanlon then pointed out to him the corresponding photos of defendants Lopez and Valerio in the arrays, and informed him that the photos in the arrays were of the same persons depicted in the newspaper photo.
Although on July 21, 1998, both the rape victim and Gaudet identified defendant Morales as being present at the time of the attack, neither identified him as having been a participant in the attack. Gaudet testified that he saw Morales sleeping nearby on a mattress although the rape victim had identified Morales from the arrays shown to her on July 15, 1998, it is not clear whether she identified him at that time only as being present or as having participated in the attack.[4] It is clear, however, that on July 21, 1998, the rape victim identified Morales as having been present in the area of the attack but not as a participant in the attack.
Applicable Legal Principles and Findings
A. Identification Procedures as Unduly Suggestive
All nine of the defendants challenge the identifications on the ground that the procedures employed were unduly suggestive and therefore prohibited by Article 12 of the Massachusetts Constitution or common law principles of fairness. In Commonwealth v. Johnson, 420 Mass. 458, 465 (1995), the Supreme Judicial Court concluded that the test to be used in *329 such a case is that set forth in Commonwealth v. Botelho, 369 Mass. 860 (1976). Under Botelho, the defendant, as the moving party, has the burden of showing, by a preponderance of the evidence, that in the light of the totality of the circumstances, an identification procedure was so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law. Id. at 866-67. Normally, the unnecessary suggestiveness must be the product of state action (i.e. improper police action). See Commonwealth v. Payne, 426 Mass. 692, 694-695 (1998); Botelho, 369 Mass. at 866. Identifications made in especially suggestive circumstances do not require state action, and a court may suppress such identification evidence on common law principles of fairness. Commonwealth v. Jones, 423 Mass. 99, 109-10 (1996) (holding that, where a witness had two highly suggestive confrontations with the defendant which neither the police nor the prosecution arranged, the witness’s identification of the defendant should be excluded under common law principles of fairness). See also, Commonwealth v. Odware, 429 Mass. 231, 235 (1999) (defendant’s motion to exclude identification on due process or common law fairness grounds properly denied). If the defendant fails to carry his burden under Botelho, no taint attaches to the out-of-court identifications or subsequent in-court identifications. See Commonwealth v. Otsuki, 411 Mass. 218, 233 (1991). If, on the other hand, the defendant’s burden is met, it then falls to the Commonwealth to demonstrate by clear and convincing evidence that a subsequent identification is based on an independent source. See Johnson, supra at 463; Botelho, supra at 866. Factors to consider in determining whether a witness’s identification derives from an independent source include: (1) the witness’s opportunity to view the perpetrator at the time of the crime; (2) the accuracy of any prior description given by the witness; (3) any prior mistaken identification or inability to identify the defendant; (4) any suggestions given to the witness regarding the identification of the defendant; and (5) the lapse of time between the crime and the challenged identification. See Commonwealth v. Holland, 410 Mass. 248, 256 (1991); see also, Johnson, supra at 464.
B. Illegal Seizure and Identifications as Prohibited Fruit of the Poisonous Tree
One or more of the defendants contended at the hearing that they were illegally arrested and that their booking photos used in the photo arrays and subsequent identifications by the victims are the result of their illegal arrests, and therefore should be excluded as illegal fruit of the poisonous tree. At a motion to suppress evidence on the ground that the defendant was arrested or stopped illegally, the Commonwealth has the burden of showing that police had probable cause for the arrest or reasonable suspicion for the stop. See Commonwealth v. Williams, 422 Mass. 111, 115 (1996); Commonwealth v. Pignone, 3 Mass.App.Ct. 403, 407 (1975). Probable cause to arrest is evaluated in light of the facts and circumstances at the moment of arrest. Commonwealth v. Gullick, 386 Mass. 278, 283 (1982). If police lacked a legal basis for the seizure, and the identification evidence was obtained as a result of the illegal seizure, the court may suppress such evidence as the illegal fruits of the unlawful seizure. See Commonwealth v. Crowe, 21 Mass.App.Ct. 456, 461 (1986) (photographic identifications suppressed on the ground that they were a product of an illegal detention resulting from an illegal arrest of the defendants).
C. The Show-up Identifications of Cruz, Cabrera and Milian-Lopez
Defendants Cruz, Cabrera and Milian-Lopez challenge the rape victim’s and Gaudet’s identification of them at the show-up identification conducted in the Waltham Police substation parking lot, on the night of July 13, 1998, on the ground that the procedures employed by the police were unduly suggestive. Show-up or one-on-one identifications are disfavored because of their inherently suggestive nature, see e.g., Johnson, supra at 461 (show-up identification unduly suggestive where: show-up conducted eighteen hours after the crime in the area where the witness had seen his assailants, the defendant was wearing clothing similar to the male assailant, and the defendant was brought forward from the group before the witness positively identified him). Nevertheless, they are permissible when conducted in close proximity to the time of the crime and in exigent circumstances. See e.g., Id. at 461 citing Commonwealth v. Barnett, 371 Mass. 87, 91-92 (1976); see also, Commonwealth v. Jones, 25 Mass.App.Ct. 55, 61 (1987). Show-up identification procedures are “justified by the need for efficient investigation in the immediate aftermath of crime. . . . while . . . recollection[s] or mental image[s] of the offender are still fresh ...” Commonwealth v. Santos, 402 Mass. 775, 784 (1988) (show-up identification not unduly suggestive where witnesses had provided police with specific descriptions of the assailants, including approximate ages and details of clothing, prior to the show-up procedure, and where witnesses told police that another show-up suspect had not been involved), quoting Barnett at 92. Prompt confrontation at a show-up may serve to free the innocent and help narrow the lines of police inquiry. See Santos at 784 citing Barnett at 92. A show-up does not become impermissibly suggestive just because police advise the victim that someone matching a description has been apprehended, see Commonwealth v. Leonardi, 413 Mass. 757, 761-62 (1992); Commonwealth v. Williams, 399 Mass. 60, 67 (1987); or because a witness views a suspect who is obviously in custody. See Commonwealth v. Bowden, 379 Mass. 472, 479 (1980). Nevertheless, a combination of these and other such factors may create a situation in which an iden *330 tification is so unnecessarily suggestive as to require suppression.
In this case, the police incorrectly told the rape victim, before she identified the three suspects, that they had been caught fleeing the crime scene. She testified that, when she first observed the three suspects they were lying face down on the ground handcuffed and shackled.[5] Having been told they were caught fleeing, she ran, in a rage, from the ambulance to where they were lying and kicked one of the defendants in the head. She was then urged by one of the police to do it again.[6] There were certainly no exigent circumstances which could justify such extremely suggestive and abusive conduct toward the suspects on the part of the police. In view of the totality of the circumstances surrounding the show-up procedure, the Court concludes that it was unnecessarily suggestive.
The question then becomes whether the Commonwealth has demonstrated, by clear and convincing evidence, that the rape victim’s and boyfriend’s subsequent identification of these three defendants in the photographic arrays, as well as any future in-court identification at trial, was, or would be, based on a reliable independent source. See Johnson, supra at 463-64; Botelho, supra at 866-67. In light of the criteria set forth in Commonwealth v. Holland, supra, the Court finds that the Commonwealth has failed to meet this burden as to the three defendants identified at the show-up: Roberto Mauricio Cruz, Fernando Cabrera, and Edgar Ovidio Milian-Lopez.
In the first place, the witnesses’ opportunity to view the perpetrators at the time of the crime is at best in doubt. While the rape victim testified that she had ample opportunity to view the faces of the perpetrators prior to and during the attack, she admitted that the crime scene was completely dark at the time of the attack except for illumination from the lights of a baseball field 200 feet away. Moreover, a photograph which she identified as a fair and accurate representation of the scene in the daytime, indicates that the crime scene was hidden on both sides of the tracks by trees and other vegetation which would have blocked out any artificial illumination. Furthermore, the Court’s own view of the crime scene on July 27, 1999 at 9:30 p.m.,[7] while the lights from the baseball field were turned on, revealed that the baseball park’s lighting does not effectively illuminate the area. The Court’s view, moreover, occurred when there was a full moon, whereas the moon on July 13, 1998, did not rise until 11:00 p.m. Furthermore, the Court’s view was taken after the MBTA had cleared trees and other vegetation from the immediate area of the crime scene, which only could have improved the lighting at the time of the view. While the Court observed some faint illumination filtering through the remaining vegetation from the lights of the baseball field over 200 feet away, there was no other lighting which affected the area, and use of flashlights was required in order to see well enough to walk there. Gaudet’s view was similarly obstructed, as he was being held on the ground from behind, six to eight feet away from the rape.
Additionally, the rape victim had been drinking throughout the day[8] and may also have been under the influence of drugs, which would tend to have affected her ability to view and remember her assailants accurately. Gaudet, who was drinking beer and vodka all day, was similarly intoxicated.
With respect to the second factor enumerated in Commonwealth v. Holland, supra, the accuracy of any prior description given by the witness, no such description was given other than that she was attacked by Hispanic males. Although Gaudet testified that he had known some of the attackers for some time, and had known several by their first names, no such names were provided to the police until after he viewed the newspaper photograph which identified each defendant by name. Likewise, although the rape victim testified that one was young and another was tall with bulging eyes, no such description was given at the time.
Also significant as to the reliabilify of any independent identification, the rape victim and Gaudet told the police and the young boy who called 911 right after the attack at the hospital, that it was six or seven men who had attacked her. Subsequently, the number of her attackers was variously described by one or the other, as nine, ten, and even fourteen or fifteen Hispanic males.[9] Although she originally complained of being raped by six to seven men, she ultimately identified the photographs of twelve suspects, two of whom were never charged by the police and another of whom had his indictment dismissed. Under these circumstances, the Court concludes that the Commonwealth has failed to meet its burden to show by clear and convincing evidence that any out-of-court or in-court identifications of these defendants by the rape victim[10] or by Gaudet, subsequent to the show-up, were, or could be, based upon a reliable independent source. See Johnson, supra at 463.
Accordingly, the Court allows the motions of Cruz, Cabrera and Milian-Lopez to suppress the identifications of them by the rape victim and by Gaudet, including any subsequent photo array or in-court identifications. In view of the Court’s ruling, it is not necessary to consider any of the other arguments of those defendants in support of suppression of identification.
D. Photo Array Identifications
1. The First Photo Array on July 15, 1998 as to Fuentes and Morales
On July 15, 1998, Detective Maher took three photo arrays, prepared by Detective Scanlon and containing eight pictures each, to St. Elizabeth’s hospital to show to Gaudet. According to Maher, in addition to the three defendants previously identified at the show-up, he identified defendant Fuentes. Likewise, on Julyl5, Detective Scanlon took the same three arrays to Arbor *331 Hospital to show them to the rape victim. In addition to the three defendants previously identified at the show-up, the rape victim identified defendants Morales and Fuentes. As these defendants have failed to show that there was anything unduly suggestive about this array as to them, or that their inclusion in the array was the result of any illegal act by the police,[11] their motions to suppress are denied.
2. The Second Photo Array on July 17, 1998 as to Espina
On July 17, 1998, Detective Fagan showed a fourth photo array, prepared by Detective Scanlon and containing eight pictures, to the rape victim and Gaudet at Arbor Hospital and St. Elizabeth’s Hospital respectively. Both identified only defendant Espina from this array. As with Fuentes and Morales, there has been no showing that Espina’s inclusion in the array was the result of any illegal police conduct or that the array was unduly suggestive as to him. Accordingly, his motion to suppress is denied.
3. The Final Photo Array on July 21, 1998 as to all Defendants
All nine of the defendants challenge the identification procedure conducted on July 21,1998 on the ground that it was unduly suggestive due to prior exposure of the identifying witnesses to highly suggestive newspaper photographs and television depictions of the defendants.
On July 21, 1998, the rape victim and Gaudet met detective Scanlon at the Waltham Police Department where they each separately viewed the four previously-viewed photographic arrays again. On this occasion, the rape victim identified all nine of the current defendants, including defendants Lopez, Valerio, and Juarez, whom she identified for the first time. With the exception of defendant Morales, she identified all of the defendants as having participated in the attack. With respect to Morales, she told Detective Scanlon that she recognized him as having been present during the attack, but she did not knowwhat he did. For his part, Gaudet identified six of the defendants, five of whom he had identified previously, along with defendant Juarez, whom he identified for the first time. Gaudet failed to identify Lopez, Valerio, and Morales from the photographic arrays as participants in the attack.[12] After viewing the arrays, Gaudet took out a newspaper photograph of the defendants taken at their arraignment on July 17,1998, while they had been seated in the dock at Waltham District Court, and pointed out defendants Lopez and Valerio from the picture.[13] Gaudet then told Detective Scanlon that Lopez and Valerio also were among the attackers. Detective Scanlon then pointed out to him pictures of defendants Lopez and Valerio contained in one of the photographic arrays, which Gaudet had seen but failed to identify. The rape victim testified that she had also seen the newspaper photograph and had seen them depicted on television about that time. Based on the testimony of Gaudet and the rape victim, the Court concludes that they each had seen the newspaper photograph and depictions of the defendants on television sometime prior to viewing the photographic arrays on July 21. Gaudet testified that the rape victim had discovered the picture, held on to the picture for several months, and would view it repeatedly. He testified that at some point he finally took it away from her because he did not think it was a good idea for her to dwell on the incident. She denied this, and claimed Gaudet had discovered the newspaper picture. In any event, there is no evidence to suggest that police or prosecutors had any involvement in the witnesses’ viewing of either newspaper photos or television depictions of the defendants, and there is no evidence to suggest that either of them was influenced in their identifications from the photo array, by any police misconduct.
The Supreme Judicial Court has stated on a number of occasions that exposure of an identifying witness to media photographs and reports regarding a defendant, absent police involvement, is not in and of itself, sufficient ground to suppress an identification. See Commonwealth v. Payne, 426 Mass. 692, 695 (1998) (identification evidence not suppressed where there was no evidence of police manipulation of the press and where the judge at the suppression hearing found that the witnesses recognized the defendant from the incident not the media photographs); Commonwealth v. Otsuki, 411 Mass. 218, 234-35 (1991) (where witness happened upon a newspaper photograph of the defendant before identifying him, the identification procedure was not unduly suggestive); Commonwealth v. Colon-Cruz, 408 Mass. 533, 542 (1990) (identification procedure was not unnecessarily suggestive where the witness had seen photographs of the defendant in newspapers prior to his identification of the defendant but where there was no evidence that the newspaper published the photograph as a result of police contrivance); cf. Commonwealth v. Day, 42 Mass.App.Ct. 242, 249 (1997) (identification procedure was unduly suggestive where, prior to the identification procedure, the witness had seen a police flyer depicting the defendant at the police station, and where the picture on the flyer was the same picture that appeared in the photographic array from which the witness identified the defendant). Although the Court believes that the witnesses’ viewing of the newspaper photograph and the television depictions of the defendants was highly suggestive, in view of the fact that there was no showing of police involvement the Court concludes that the identifications made by the rape victim and Gaudet on July 21, 1998, should not be suppressed on the ground that they were unduly suggestive solely because of the newspaper and television depictions of the defendants.
Nor is there merit in the suggestion that the arrays were suggestive simply because one of the defendants was older than the others, see Commonwealth v. Libby, *332 21 Mass.App.Ct. 650, 654-56 (1986), or because all of the arrays depicted h number of the defendants, see Commonwealth v. Avery, 12 Mass.App.Ct. 97, 100-02 (1981). Gaudet’s identification of Lopez and Valerio in the photo arrays, however, was the result of Detective Scanlon’s coaching him that the newspaper photos were of the same people, and will be suppressed.
E. Suppression of Physical Evidence
Although the defendants’ motions sought to suppress only their identification, one or more of the defendants also urged that physical evidence (such as photographs of fresh scratches on Cruz’s arms and back, mug shots, and possible DNA evidence from defendants’ blood samples) should also be suppressed as the fruit of illegal arrests. Except with respect to Milian-Lopez, however, each of the defendants were implicated in statements given by Espina and Escobar on July 14, 1998, so that their arrests and the consequent obtaining of the physical evidence as to them was inevitable in any event. See Commonwealth v. Fredette, 396 Mass. 455, 459 (1985). Milian-Lopez, however, was not implicated by any other defendant and was in fact, exculpated by both Espina and Escobar.[14] Unless his own statement is inculpatory, and its suppression is reversed, he is implicated only by the suppressed identifications by the rape victim and Gaudet.[15] Nevertheless, his physical evidence should not be suppressed, as the police did have probable cause to arrest him based upon his identification at the show-up and the photo arrays, since ”[p]robable cause to arrest exists where the facts and circumstances in the arresting officer’s knowledge and of which he or she has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed.” Commonwealth v. Williams, 422 Mass. 111, 119, n.11 (1991).
ORDER
Accordingly, the motions of Roberto Mauricio Cruz, Fernando Cabrera and Edgar O. Milian-Lopez to suppress identifications, including the show-up, photo arrays and any in-court identification, are ALLOWED.
The motions of all of the other defendants to suppress identifications, including any identification of the photo arrays, and any in-court identification, are DENIED, except that the motions of Rene Lopez and Oscar Valerio are ALLOWED insofar as they seek to suppress any July 21, 1998, photo array identifications of them by Gaudet.
Physical evidence (i.e., mug shots or DNA) taken from any of the defendants is not suppressed.

 Gaudet placed the attack at about 8 p.m., but the Court concludes that the rape victim’s estimate was more accurate in view of the fact that the 911 call which occurred shortly after the fifteen to thirty minute attack, was received at 10:22 p.m.

 Gaudet had been brought to the show-up scene in a police cruiser. His testimony that the police asked him whether he could identify only one of the suspects who were present at the show-up, is simply not credible under the circumstances.

 The rape victim also viewed another photographic array in September 1998 from which she identified another suspect who was never indicted. In total, in spite of having originally told the police and the boy who called 911 that she had been raped by six or seven males, the rape victim ultimately identified twelve men as having participated in the attack, two of whom were never indicted, and another of whom, Gutberto Escobar, was indicted, but the indictment was later dismissed by another judge of the Superior Court.

 As a result of this, and the fact that Morales was exonerated by one of the defendants, and implicated by only one of them (see attached hearing exhibits 12 and 17, a summary of events, attested to by Detective Scanlon), his bail was reduced to personal recognizance after the close of the hearing.

 The Court does not credit her memory as to the suspects being shackled, as police do not ordinarily use shackles at the time of an arrest.

 One of the police corroborated that she attempted to kick one of the suspects but, not surprisingly, denied telling her to do it again. Another of the police denied the entire incident. The Court generally credits her testimony of the circumstances surrounding the show-up identification.

 As noted, the crime occurred between 9:30 and 10:00 p.m. on July 13, 1998.

 Hospital records indicate that she said she had been on a drinking binge for a week. Her blood test that evening indicated a blood/alcohol level of .176, i.e., twice that required to find a person who is driving to be intoxicated. In addition to consuming alcohol during the day of the incident, the rape victim testified that on or about the date of the incident she had been taking trazodone to help her sleep at night and that she may also have been taking prozac. Her hospital toxicology report indicated that, in addition, her blood contained dilentin and benzorazapine.

 For instance, Officer Manganelli testified that the rape victim first told him she had been raped by six or seven men, but later at the hospital she told him she had been raped by 14 or 15 men.

 Cruz presents a closer case than the other defendants in this regard, as the rape victim testified that the “young one” initiated the encounter by kissing her arm, and that she had told him to stop. While she may have had a better opportunity to observe him than she did the others, however, the Court concludes, based on all of the circumstances, that the Commonwealth has not shown by clear and convincing evidence that she had a reliable independent basis for his identification.

 See also discussion atp. 17, infra.

 Gaudet told detective Scanlon that he had observed defendant Morales sleeping on a mat near the scene of the crime prior to the attack and like the rape victim, he did not identify Morales as a participant in the attack.

 A copy of this picture, along with an accompanying article, which was published in the Boston Herald on July 18th, 1998, was introduced into evidence at the hearing. The photograph bears the names of the eight defendants depicted therein.

 See attached hearing Exhibits 12 and 17, a chronological summary of events, attested to by Detective Scanlon.

 Accordingly, unless there is other evidence (such as DNA) to link him to the attack, his counsel should consider a motion to reduce his bail, and the Commonwealth may wish to consider a nolle prosse of that defendant.