Agnes, A.J.
INTRODUCTION
On or about December 19, 2002, there was a shooting at the Denny’s Restaurant located at 494 Lincoln Street in Worcester. Two people were shot. The defendants are brothers. One of the defendants is alleged to have fired a weapon at the victims and the other is alleged to have also had a weapon and to have participated in the assault as a joint venturer.
FINDINGS OF FACT
Susan Nordstrom has worked as a waitress at the Denny’s Restaurant located at 494 Lincoln Street in Worcester for the past 11 years. The restaurant is open 24 hours a day. On December 19, 2002 she was working the 10:00 p.m. to 6:00 a.m. shift. One other waitress was on duty at the time of the events that are the subject of this case. There were about 30 people in the restaurant. At approximately 3:00 a.m., there was an argument between two groups of people over a woman who had just left the restaurant. Christopher Crawley, a 33-year-old Worcester firefighter who was at the restaurant with a relative, Ed Crawley, and a friend, Mike Ash, intervened to break up the argument. Mr. Crawley got a good look at the man who started the argument. The police responded as a result of the argument. The group containing the person who started the argument included a man known to Ms. Nordstrom as a regular customer who she had waited on many times. This man (who she later identified as the shooter’s companion) said to one of his friends “C’mon man; it’s not worth it.” She saw several men from this latter group leave the restaurant.
About twenty minutes later, a man entered the restaurant wearing a mask. She could not identify this person, but described him as 5 feet, 11 inches to six feet tall, black, light-skinned male, 180-200 pounds, husky, and with dred locks. Chris did recognize the masked man as the person who had started the argument about 20 minutes earlier based on the similarity in the clothing and physical build. Chris recognized the shooter when he entered the restaurant and told his companions “he’s back.” There was a brief altercation. Suddenly, the masked man displayed a handgun. Ms. Nordstrom saw the masked man raise his hand in which he held a silver-colored handgun. Chris’s companions — Ed and Mike — approached the shooter and got on top of him. Chris tried to grab the gun. He went down. Ms. Nordstrom heard shots fired. Chris was shot in the shoulder, but didn’t know it at first. The shot was fired while the shooter was on the floor on his back. Chris realized that there was another man standing over him who also had a gun which was pointed at him. He hadn’t seen this man enter the restaurant. Chris, Ed and Mike backed away and let the shooter get up.
Chris recognized this second man has someone he had seen before at an apartment complex known as Greatbrook Valley. This second man told Chris, Ed and Mike to “get off.” Ms. Nordstrom also recognized this man with the gun. He was a man who had been involved in the earlier argument. She also recognized him as a person who was a regular customer in the restaurant. She had waited on him many times. She observed the pair from a short distance away under bright lighting, and was face to face with them for a few minutes.
After the shooting, Ms. Nordstrom went to the office and called the police. When she returned to the area of the shooting, she saw one man on the floor, and a man outside the restaurant. The shooter was gone. Chris was taken to U. Mass. Memorial Hospital for treatment of his injuries.
Detective Francis Bartley, a veteran of 17 years with the Worcester Police department, was one of the police officers who responded to the scene of the shooting. Based on information received from eyewitnesses at the scene, including their physical descriptions of the assailants, and police sources, he suspected the defendants were the perpetrators. He prepared two arrays of photographs each consisting of 9-10 people who he regarded as similar in appearance including in one case Tyjuan Berry and in the other Tyuane Berry. The Worcester Police Department does not have guidelines on how to create a photographic array. *478 Detective Bartley prepared the arrays in this case himself by obtaining photographs of the 2 suspects and then collecting 9-10 other photographs of similar looking people as fillers. Detective Bartley reviewed about 100 photographs from the department’s computerized data base to obtain the fillers he used in this case. In this case, the two arrays each contain one picture in common (#3 in exhibit 1 and #9 in exhibit 2).
There was no contact between the police and the eyewitnesses between the date of the incident and January 3,2003. What prompted the police to conduct the identification procedures was information received that suggested the defendants were involved in the shooting. The police visited Ms. Nordstrom on January 3 or 4, 2003. Two officers were present including Detective Bartley. He displayed a series of photographs down on her table and asked her if any of these men had been in the restaurant on December 19th. He did not tell her a suspect was among the photographs. All of the photographs were of the same size (8x10 or 9x12). There was no writing on any of the photographs. She picked one of the photographs as the shooter’s companion — the man who was the regular customer in the restaurant and who had been involved in the original argument before the shooting. She took about one minute to look at the photographs before selecting one. Detective Bartley did not inform her that a suspect’s photograph was among those she was asked to view and did not mention the name of any of those individuals. He simply said “thank you.” Detective Bartley did not direct or coach the witness to make an identification.
The police visited Christopher Crawley at the fire station on January 3, 2003. He was shown a series of ten photographs. See exhibit 1. The police told him to look at the photographs and determine whether you can identify anyone who was involved in the shooting. After looking at the photographs for about a minute, he picked out one photograph (#4) and told the police he was “90% sure” it was the shooter. Picture #4 is the photograph of Tyuane Berry. The following day, the police visited him again and asked him to look at a second group of photographs (exhibit 2). The police told him to look at the photographs and determine whether you can identify anyone who was involved in the shooting. After looking at the photographs, he picked out one photograph (#5) and told the police that it was the other guy with the gun who I know. Picture #5 is the photograph of Tyjuan Berry. Detective Bartley did not direct or coach the witness to make an identification. At the end of this procedure, Detective Bartley told him that a warrant would be sought.
Before these identification procedures, Chris learned the name of the shooter from “his informants” based on a physical description he provided. The physical description of the shooter which Chris gave to the police and his friends was a black man, taller than Chris, medium build, braids, and gold teeth. The name of the person he described as the shooter which he received from his friends was “Tyuane Berry.” He figured out the name of the second gun man on his own.
RULINGS OF LAW
1. Analytical Framework Governing Pretrial Identification Procedures
A. The problem of Eyewitness Identification
“There is no question that the danger of mistaken identification by a -victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primaiy cause of erroneous convictions.” Commonwealth v. Johnson, 420 Mass. 458, 465 (1995).[1] Accord, Commonwealth v. Jones, 423 Mass. 99, 109 (1996) (“Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant”). See also Commonwealth v. Francis, 390 Mass. 89, 100 (1983) (“One of the most troublesome problems in the administration of criminal justice is the possibility that eyewitness identification testimony is wrong, given by a witness who sincerely but wrongly believes in the accuracy of his or her identification”). Unlike evidence seized in violation of the rules governing searches and seizures, or at least some statements obtained in violation of the Miranda doctrine, mistaken identification evidence jeopardizes the ability of the factfinder to perform its role at trial and diminishes the value of the trial process. Commonwealth v. Johnson, supra, 420 Mass, at 470, quoting People v. Adams, 53 N.Y.2d 241, 250-51 (1981). The problem arises not only due to the methods used by the police to secure identification evidence, but is attributable in part to factors relating the characteristics of the eyewitness and the perpetrator. See Commonwealth v. Zimmerman, 441 Mass._,_(March 9, 2004) (Cordy, J. concurring) (pointing out the risks involved in cross-racial identifications because “the evidence is now quite clear that people are better able to recognize faces of their own race or ethnic group than faces of another race or ethnic group,” quoting G. L. Wells, Eyewitness Testimony, 54 Ann.Rev.Psychol. 277, 280-81 (2003)).
B. The Constitutional Standard for Exclusion of Eyewitness Identification
In Massachusetts there exists both a constitutional and common-law basis for the exclusion of eyewitness identification evidence. The constitutional test was outlined in Commonwealth v. Botelho, 369 Mass. 860, 866-67 (1976). Under this test, the defendant bears the burden of establishing that the identification procedure was unnecessarily suggestive. If the defendant offers evidence that this is a “live” issue in the case, the court is required to examine the totality of the circumstances of the identification in order to make *479 the determination. Commonwealth v. Santos, 402 Mass. 775, 781 (1988). “This has been understood to refer to the episode itself; it does not extend to a consideration of the witness’s entire connection with the case to determine whether the confrontation, although set up in such a way as to be unnecessarily suggestive, was nevertheless reliable, and therefore usable — for example, because the witness had a clear perception of the offender and would not be misled by a one-on-one confrontation or the like.” Commonwealth v. Botelho, 369 Mass. 860, 867 (1976). See generally K.B. Smith, Criminal Practice & Procedure §447 (2d ed. 1983 & Supp. 2001) (collecting cases). By contrast, in the federal system and under the law in most other jurisdictions, the analytical linchpin in such cases is simply whether the witness’s identification was reliable. See W.R. LaFave, J.H. Israel, & N.J. King, 2 Criminal Procedure §7.4(c) (West Pub. 1999). This point was underscored in Commonwealth v. Johnson, supra where the Supreme Judicial Court rejected the test adopted by the United States Supreme Court in Manson v. Braithwaite, 432 U.S. 98 (1977), in favor of a rule of per se exclusion for unnecessarily suggestive identification procedures that create a risk of mistaken identification regardless of any circumstantial guarantees of reliability. “[A]rt. 12 requires the application of the stricter per se approach described in Commonwealth v. Botelho, supra . . . The ‘reliability test’ is unacceptable because it provides little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications and, ultimately, from wrongful convictions.” Commonwealth v. Johnson, supra, 420 Mass, at 465, 466.[2] See Commonwealth v. Thornmley, 406 Mass. 96, 100 n. 3 (1989).[3]
If the defendant meets that burden of establishing suggestiveness, the Commonwealth bears the burden of proving by clear and convincing evidence that the witness’s identification in court stems from a source that is independent of the taint that is attributed to the unnecessarily suggestive identification procedure. Botelho, supra, 369 Mass, at 869.
C. The Common-law Standard for the Exclusion of Eyewitness Identification
Apart from whether the defendant is able to meet the burden of establishing that an eyewitness identification was unnecessarily suggestive, exclusion of the identification might nonetheless be appropriate on the basis of common law considerations of fairness. However, this theory does impose a lower threshold on the defendant who seeks to exclude identification evidence than the constitutional threshold in terms of suggestiveness. It merely affords the court a basis for acting to keep unreliable evidence from the fact finder in circumstances in which the defendant is unable to establish that state action was at work in the events that led to the identification. See Commonwealth v. Jones, 423 Mass. 99 (1996) (“If a witness is involved in a highly suggestive confrontation with a defendant and that witness’s in-court identification of the defendant is not shown to have a basis independent of that confrontation, the admissibility of the witness’s proposed testimony identifying the defendant should not turn on whether government agents had a hand in causing the confrontation. The evidence would be equally unreliable in each instance”; holding that common-law principles of fairness require the exclusion of an identification based on a highly suggestive encounter between the witness and the defendant while the latter was in custody at the courthouse.).
2. Proposals to Address the Problem of Unnecessarily Suggestive Identification Procedures
The attention that eyewitness identification procedures have received in recent years in court decisions and academic writings, as well as in the popular press, led the United States Department of Justice to undertake a comprehensive review of the well documented problems, and to propose a systematic reform. In 1998, then Attorney General Janet Reno, called for the development of national guidelines for the collection of eyewitness evidence. A panel was formed under the auspices of the National Institute of Justice. Eventually a Working Group was established that included researchers in the field of eyewitness identification procedure, fourteen law enforcement persons (from thirteen different states), four prosecutors, and three defense lawyers. This group produced a consensus document that was approved by Attorney General Reno and published by the United States Department of Justice in October, 1999. The 55 page report is entitled Eyewitness Evidence: A Guide for Law Ervforcement C‘Guide”).[4] The report is accompanied by a Message from the Attorney General in which she stated that “in developing its eyewitness evidence procedures, every jurisdiction should give careful consideration to the recommendations in this Guide and to its own unique local conditions and logistical circumstances. Although factors that vary among investigations, including the nature and quality of other evidence and whether a witness is also a victim of the crime, may call for different approaches or even preclude the use of certain procedures described in the Guide, consideration of the Guide’s recommendations may be invaluable to a jurisdiction shaping its own protocols. As such, Eyewitness Evidence: A Guide for Law Enforcement is an important tool for refining investigative practices dealing with this evidence as we continue our search for truth.” Guide, at iii-iv (NIJ, Oct. 1999).
The Guide is not in the form of a procedural rule that purports to define every circumstance in which a one-on-one identification procedure is or is not justified. Instead, it is a guideline which suggests an approach to identification procedures that avoids suggestive police practices.[5] The Guide is not only *480 suitable for use as instructional material in recruit and in service police training programs throughout the Commonwealth, but also should be considered by the police agencies and departments in the development of policy standards.[6]
Among other things, the Guide outlines an approach to obtaining information from witnesses at the scene, an approach to compiling a live or photographic lineup or array, and an approach to conducting the identification procedure.
In particular, the Guide suggests that “(p)rior to presenting a lineup [or an array], the investigator shall provide instructions to the witness to ensure the witness understands that the purpose of the identification procedure is to exculpate the innocent as well as to identify the actual perpetrator.” Guide at 31. In particular, before presenting a photo array, the Guide suggests that witnesses should be told it is just as important to clear the innocent as to identify the guilty party; that persons depicted in the array may not look exactly as they did at the time of the offense; that the person or persons who committed the crime may or may not be in the lineup; that whether or nor an identification is made the police will continue with the investigation; that the procedures employed by the police require the investigator to ask the witness to state, in his or her own words, how certain the viewer is of his or her identification. Guide Section v. at 31 -32.
The Guide also contains a recommendation about how police should compile photographic arrays. It suggests that only one suspect should be included in each identification procedure along with at least 4 non-suspect fillers. These fillers “should generally fit the witness’s description of the perpetrator,” or, absent such a description or when the description doesn’t match the suspect, the description of the suspect. The Guide further states that “complete uniformity” is not required, but recommends against using fillers who so closely resemble the suspect that even people who know the suspect might have difficulty in picking him or her out. The Guide suggests that the person compiling the array should “]c]reate a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature.” The police should avoid using the same fillers in arrays shown to the same witness. Guide, Section v. at 29.
3. Whether the Identification Procedures Conducted by the Worcester Police Were Unnecessarily Suggestive
The defendants bear the initial burden of demonstrating that the witnesses (Christopher Crawley and Susan Nordstrom) were subjected to identification procedures that were unnecessarily suggestive. Commonwealth v. Johnson, supra, 420 Mass, at 463, quoting Commonwealth v. Botelho, 369 Mass. 860, 866 (1976). This determination is to be based on the totality of the circumstances. Johnson, supra, 420 Mass, at 464, quoting Botelho, supra, 369 Mass, at 867. The defendants maintain that the Worcester police conducted an unnecessarily suggestive identification procedure because (I) they did not properly instruct the witnesses before they asked the witnesses to view the photographs, and (2) the composition of the array itself was unfair.
With respect to the instructions given to the witnesses, there is no mandatory procedure which the police are required to follow. There is no evidence in this case that the police violated any policy or guideline adopted by the Worcester Police department. While the police did not follow the specific instructions recommended in the Department of Justice Guide, there is nothing in the statements made by the police prior to the identifications that may be characterized as suggestive.
With respect to the composition of the lineup or array, the defendants maintain that the procedures were suggestive because the photographs selected by the police as fillers do not resemble the suspect and are not consistent with respect to unusual features. See DOJ Guideline, Section v. at 29. It is true that in exhibit 1, photo #1 depicts a man with a nose ring, a feature not shared by anyone else and not referenced in the witness’s descriptions. Also, the defendants argued that a number of the men in exhibit 1 and exhibit 2 have the hair braided or in com rolls as opposed to dredlocks. However, the suspect in exhibit 1 (#4) appears to have braided hair. Moreover, (as counsel conceded) it is veiy difficult to be certain, based on these photographs, what style of hair is involved in the case of each of the men depicted. In fact, there is no assurance that persons who describe features such as “braids,” “dredlocks,” “Com rolls,” “spiked hair,” etc. are using these descriptions in a consistent manner or that individuals agree on a common nomenclature for the description of characteristics such as hair style. In terms of skin complexion, facial hair, age, and body type (insofar as that feature is discemable at all), the photographs are not so dissimilar as to make the identification procedure unnecessarily suggestive.
ORDER
For the above reasons, the defendants motions to suppress are DENIED.[7]

In Commonwealth v. Johnson, supra, the Supreme Judicial Court explained that the concern about the risks associated with mistaken eyewitness identification procedures are not based on merely theoretical grounds. “[S]tudies conducted by psychologists and legal researchers since Brathwaite [Manson v. Braithwaite, 432 U.S. 98 (1977)], have confirmed that eyewitness testimony is often hopelessly unreliable.” See also United States v. Wade, 388 U.S. 218, 228 (1967) (“]T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification”); Commonwealth v. Marini, 375 Mass. 510, 519 (1978) (“The law has not taken the position that a jury can be relied on to discount the value of an *481 identification by a proper appraisal of the unsatisfactory circumstances in which it may have been made"). See generally Steven Penrod, “Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing?” 18 Criminal Justice 36 (No. 1, 2003) (American Bar Association) (analyzing studies about the accuracy of eyewitness identification evidence). Commonwealth, v. Johnson, supra 420 Mass, at 467.

The Supreme Judicial Court added that “[o]ne commentator has noted that ‘under Brathwaite [Manson v. Braithwaite, 432 U.S. 98 (1977)], the showup has flourished, because the totality approach has failed to discourage this practice. As a deterrent to suggestive police practices, the Federal standard is quite weak. Almost any suggestive lineup will still meet reliability standards.’ ” Commonwealth v. Johnson, supra, 420 Mass, at 468, quoting Note, Twenty Years of Diminishing Protection, 15 Hofstra L.Rev. 583, 606 (1987).

Despite the vigorous dissent of three justices in Commonwealth v. Johnson, supra, where it was noted that the Braithwaite reliability standard is the rule in almost every other jurisdiction, Commonwealth v. Johnson, supra 420 Mass, at 477 (Greaney, J. dissenting), the criteria outlined in Braithwaite have been shown to be deficient on numerous grounds. See Wells et al., “Eyewitness Identtfication Procedures: Recommendations for lineups and. Photospreads," 22 Law and Human Behavior 1, 24 (1998).

The full report is available on the World Wide Web at http://www.ncjrs.org/txtfilesl/nij/178261.txt. The defendants in this case have attached a copy of the Report to their Memoranda of Law in support of the motion to suppress.

A copy of Section v. of the Guide dealing with live and photographic lineups and arrays is contained in Appendix A. Other research suggests that the Guide does not go far enough. “]T]he primary role played by eyewitness confidence in the legal system’s assessment of the credibility of the identification, in conjunction with the clear empirical evidence of confidence malleability, demands that confidence statements be obtained at the time of the identification (before other variables begin to exert their influence on the eyewitness) .” See Wells et al., “Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 Law and Human Behavior 1, 33 (1998).

Legislation proposing statutory guidelines to govern pretrial identification procedures by the police, consistent with the 1998 Justice Department Guide, has been filed in this session of the Massachusetts legislature on the House side by Representatives O’Flaherty, Fallon and Candaras, House Bill No. 748, and on the Senate side by Senators Creem and Creedon. Senate Bill No. 173. It appears that at least one state, New Jersey, has adopted the recommendations contained in the Guide. See Steven Penrod, “Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing?" 18 Criminal Justice 36, 54 (No. 1, 2003); Comment, Mistaken Identifications Cause Wrongful Convictions, 43 Santa Clara L.Rev. 213 (2002).

The defendants have not attached any special significance to the cross-racial character of the identifications in this case. In the case of Ms. Nordstrom, she knew the person she identified from close personal contact prior to the shooting. In the case of the victim, William Fowler, he too knew one of the assailants by sight before the shooting. This is a matter that counsel may pursue at trial. See Commonwealth v. Zimmerman, supra 441 Mass. 146, 153-56 (2004) (Cordy, J., concurring).